2011 ME 74

**STATE of Maine**

v.

**Stanley L. WARD.**

Supreme Judicial Court of Maine.

Argued: April 13, 2011.
Decided: June 30, 2011.

predated the relevant court order and would not support an equitable estoppel argument.

Jeremy Pratt, Esq. (orally), Camden, ME, for Stanley Ward.

Neil J. Prendergast, Asst. Dist. Atty., Eric J. Walker, Asst. Dist. Atty. (orally), Belfast, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶ 1]   Stanley L. Ward appeals from a judgment of conviction entered by the Superior Court (Waldo County, *Hjelm, J.*) following his guilty plea to a complaint charging him with robbery (Class A), 17–A M.R.S. § 651(1)(C) (2010); kidnapping (Class A), 17–A M.R.S. § 301(1)(A)(3) (2010); and attempted murder (Class A), 17–A M.R.S. § 152(1)(A) (2010).   The court imposed concurrent sentences on the kidnapping and attempted murder counts and a consecutive sentence on the robbery count;   the resulting aggregate sentence was fifty years, all but forty-five years suspended, with four years of probation, and a restitution order of $10,226.   Ward challenges the sentences on the grounds that (1) the length of the sentences, both individually and collectively, violated his constitutional protection against cruel or unusual punishment;   (2) when the court found the facts necessary to impose consecutive sentences, resulting in a longer period of incarceration than the statutory maximum for any of his convictions individually, it violated his constitutional right to trial by jury;   and (3) the court erred in its application of 17–A M.R.S. § 1256 (2010)[1] in imposing consecutive sentences.

1.  In the portion pertinent to this appeal, the statute provides:

   2.  ... [S]entences shall be concurrent unless, in considering the following factors, the court decides to impose sentences consecutively:

   A.  That the convictions are for offenses based on different conduct or arising from different criminal episodes;  [or]

   ....

   D.  That the seriousness of the criminal conduct involved in either a single crimi-

## I. BACKGROUND

[¶ 2] With the exception of a minor point noted below, the facts are undisputed. In November 2009, Stanley Ward had been having financial problems—for example he told police that he had a truck payment coming due—so he formulated a plan to rob, kidnap, and murder a sixty-seven-year-old woman who was a client of his father's lawn care business. When he learned that the woman had left town for Thanksgiving, he changed his target to another of his father's clients, a seventy-two-year-old widow living alone at her home in Belfast.

[¶ 3] After planning his attack for two days, Ward gathered his hunting knife and some black duct tape and went to the victim's home on November 24, 2009, arriving at about 4:30 in the afternoon, some ten minutes after the victim returned home from a day out with friends. Ward told the victim that he had been fired from two jobs, told her (falsely) that his father had suffered a major stroke, and asked if he could talk to her. She let him in and asked what she could do to help; Ward asked if he could do some yard work for her to earn money and she agreed.

[¶ 4] At that point Ward grabbed the victim and put his knife to her throat, threatening to kill her if she made any noise. He pushed her into the bathroom and threw her to the floor, breaking two of her front teeth, then bound her hands behind her with duct tape. Ward demanded money; the victim said he could have whatever money was in the house, and she gave him what she could find. Unsatisfied, Ward forced the victim to write him a check for $300. In the course of obtaining the money, Ward lifted the victim off the floor by her arms, injuring her shoulder.

[¶ 5] Taking the keys to the victim's car, Ward forced her out of the house and into the back seat, ordered her to lie down, and again told her that if she made any noise he would kill her. They drove through Belfast and out of town for a little over nine miles, eventually proceeding down a long dirt road known as Dutton Pond Road. The victim was praying during the approximately fifteen-minute ride, and Ward asked her what she was saying. Certain that Ward was going to kill her, she told him that she was saying the Lord's Prayer.

[¶ 6] Eventually Ward stopped at a small, dilapidated, abandoned trailer where he had previously spent time with his girlfriend, forced the victim out of the car into the doorway, then slammed her to her knees inside the trailer. Ward displayed his hunting knife and the victim begged for her life, saying, "Please don't hurt me." Ward laughed, said "Why not?" and cut her throat. He then asked her, "Are you bleeding yet?" "Are you bleeding good yet?" The victim lost consciousness for brief periods from blood loss and shock.

[¶ 7] Ward left for a short time, then returned to ask the victim, "Are you dead yet?" Seeing that she was not, he cut her throat a second time. Once again, Ward left briefly and returned;[2] finding the vic-

nal episode or in multiple criminal episodes ... require[s] a sentence of imprisonment in excess of the maximum available for the most serious offense.

**3.** A defendant may not be sentenced to consecutive terms for crimes arising out of the same criminal episode when:

. . . .

**B.** One crime consists only of a conspiracy, attempt, solicitation or other form of preparation to commit, or facilitation of, the other.

17–A M.R.S. § 1256(2), (3) (2010).

**2.** During the hearings when he pleaded guilty and was sentenced, Ward did not dispute the substance of what the State said he did, but did dispute that he left the scene and returned several times while doing so. The trial court found these timing disputes to be "fairly minor" issues.

tim still alive, he cut her throat a third time, struck her repeatedly in the head with the butt end of his knife, and then sunk the knife to its hilt into the area between her neck and shoulder, causing nerve damage that still severely affected her at the time of sentencing. Before she lost consciousness, the victim heard Ward say, "Well, you're dead now."

[¶ 8] Leaving the victim for dead inside the trailer, Ward disposed of the knife and drove back to Belfast, where he parked the victim's car back in her driveway, then left in his truck. He went to the bank and deposited the check the victim had written him earlier, then went to a convenience store where he bought "Twisted Tea" and some cigarettes. Eventually he drove back to Dutton Pond Road to see if the victim was dead, but turned around without entering the trailer after concluding that she must be. He then went to his girlfriend's house, where he drank some of the Twisted Tea and smoked marijuana with his girlfriend and her father. Eventually he went home and went to bed.

[¶ 9] Fortunately, Ward's assumption that the victim was dead was wrong. She regained consciousness in the trailer and attempted to stand several times, but kept losing consciousness from blood loss. Finding that she was able to stay awake if she remained horizontal, she crawled to the door of the trailer, kicked it open, then crawled outside and down the road. She realized that she was bleeding badly; an emergency room physician who spoke at sentencing hypothesized that only a combination of low blood pressure resulting from blood loss and the cold temperatures slowed the bleeding enough so that she did not die. As she crawled down the road, the victim saw a truck approaching that she thought was Ward's. To avoid discovery, she rolled into a ditch filled with cold water. Eventually the truck drove back

down the road, past the victim still lying in the ditch, and left the area.

[¶ 10] The victim crawled a long distance to the main road, where she collapsed. She was discovered by a passer-by, who first thought she was a bloody deer that had been hit by a car. She was taken by ambulance to Waldo County General Hospital, where she was examined by an emergency room physician before being transported to Eastern Maine Medical Center. The doctor told the court at sentencing that Ward had inflicted a "very significant," "pretty extensive" wound to the victim's throat, extending all the way through her neck to her larynx. He said, "[I]t was ... surprising to me that she didn't die, to be honest." The victim told the court that she had been advised by her doctors that her disabling shoulder injuries were permanent because vital nerves had been severed.

[¶ 11] The victim was able to identify Ward as her attacker when questioned by police in the emergency room. He was arrested the next morning and eventually waived his *Miranda* rights and spoke to police. Ward admitted that he had planned the attack for two days, said that he had initially targeted a different woman, and acknowledged that when he cut the victim's throat he intended to kill her. Ward agreed to recreate what had happened for officers, and the resulting video, shot within twenty-four hours of the attack, was shown at sentencing. Ward's demeanor in the video was a significant factor in the court's finding that he lacked remorse:

> [T]here are several aspects of this case, which I think demonstrate very clearly that Mr. Ward just does not get it. [H]is demeanor, the way he acted, his conduct when he was present with the investigator within 24 hours of this incident, was chillingly cold.... [W]hat we

saw today ... during the time that Mr. Ward ... was with investigators, as shown in the recordings today, Mr. Ward showed not one trace of emotion. And, as Mr. Ward was describing what he had done ... not even 24 hours before to [the victim], he might as well— he might just as well have been talking about the weather.

[¶ 12] Ward was charged by complaint and waived indictment. He entered open guilty pleas at a M.R.Crim. P. 11 hearing held April 13, 2010, and the matter was continued for sentencing. At a hearing held July 14, 2010, the court imposed the following sentences:

Count 1: Robbery—20 years' imprisonment, all but 15 years suspended, 4 years of probation, consecutive to Counts 2 and 3, commencing after the sentences on Counts 2 and 3 are served; Count 2: Kidnapping—20 years, concurrent with Count 3, preceding Count 1; Count 3: Attempted Murder—30 years, concurrent with Count 2, preceding Count 1.

The net result required Ward to serve forty-five years of a fifty-year aggregate sentence, followed by four years of probation.

[¶ 13] Ward filed this direct appeal and an application to allow an appeal from sentence. The Sentence Review Panel denied leave to appeal from the sentence by order dated September 30, 2010, SRP–10–433. *See* 15 M.R.S. § 2152 (2010).

## II. DISCUSSION

### A. Cruel or Unusual Punishment

■ [¶ 14] Ward first contends that his sentence of thirty years for attempted murder, and aggregate sentence of fifty years, violate the Eighth Amendment to the United States Constitution and article I, section 9 of the Maine Constitution because they are so disproportionate to his crimes that they amount to cruel or unusual punishment.[3] The asserted illegality of a sentence may be raised on direct appeal as a matter of right. *State v. Horr,* 2003 ME 110, ¶ 9, 831 A.2d 407, 411.

[¶ 15] As an initial matter, neither the general propriety of the sentences imposed by the Superior Court, nor Ward's lack of a serious criminal record or other individual factors, have any significance in determining whether his punishment is unconstitutional. *See State v. Schmidt,* 2010 ME 8, ¶ 5, 988 A.2d 975, 977 ("[O]n direct appeal, we review only the legality, not the propriety, of a sentence."); *State v. Gilman,* 2010 ME 35, ¶ 21, 993 A.2d 14, 21 (holding that article I, section 9 of the Maine Constitution "does not require consideration of the individual circumstances of each offender").

■ [¶ 16] Under the Maine Constitution, whether a punishment is unconstitutionally disproportionate to the offense committed or is otherwise cruel or unusual are closely related, but not identical, questions. *See Gilman,* 2010 ME 35, ¶ 14 n. 6, 993 A.2d at 19. The Eighth Amendment does not mention disproportionate punishments explicitly, but rather incorporates the principle that a grossly disproportionate punishment is cruel and unusual. *See Graham v. Florida,* 560 U.S. ——, ——, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825, 835 (2010) ("For the most part ... punishments [are] challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment."). Unlike the Eighth Amendment, article I, sec-

---

**3.** The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, while article I, section 9 provides that "all penalties and punishments shall be proportioned to the offense," and bars "cruel [ ]or unusual punishments," Me. Const. art. I, § 9, cls. 2, 5.

tion 9 of the Maine Constitution explicitly separates the two protections into an affirmative command and a prohibition: "[A]ll penalties and punishments shall be proportioned to the offense"; "nor [shall] cruel nor unusual punishments [be] inflicted." Me. Const. art. I, § 9, cls. 2, 5.

[¶ 17] Accordingly, under our state constitution a punishment can violate article I, section 9 if it is disproportionate to the offense for which it is being imposed, even if it is not cruel or unusual in the sense that it is inherently barbaric. In practice, "[a]lthough the Maine Constitution, unlike the United States Constitution, delineates the protections against disproportionate punishments and cruel or unusual punishments separately, both the Supreme Court and this Court have understood them to be related." *Gilman*, 2010 ME 35, ¶ 14 n. 6, 993 A.2d at 19.

[¶ 18] The test we have applied to determine whether a particular punishment violates article I, section 9 is "whether [the sentence imposed] is greatly disproportionate ... and whether it offends prevailing notions of decency, whether it shocks the conscience of the public, or our own respective or collective sense of fairness, or whether it is inhuman or barbarous."[4] *Id.* ¶ 23, 993 A.2d at 22 (alterations omitted) (quotation marks omitted). In applying that test, we are mindful that "only the most extreme punishment decided upon by [the Legislature] as appropriate for an offense could so offend or shock the collective conscience of the people of Maine as to

be unconstitutionally disproportionate, or cruel and unusual." *Id.*

[¶ 19] The United States Supreme Court has cited a similar standard: "[T]he Eighth Amendment contains a narrow proportionality principle, that does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Graham*, 560 U.S. at ——, 130 S.Ct. at 2021, 176 L.Ed.2d at 836 (quotation marks omitted). The Court explained that it is "the rare case" that can support an inference of gross disproportionality; in fact, it cited only one in *Graham*, discussing a case where the Court held unconstitutional a sentence of life without parole for a repeat nonviolent felon convicted of passing a worthless check. *Id.*

■■■ [¶ 20] Examining Ward's thirty-year sentence for attempted murder, the facts amply support the Superior Court's conclusion that "this was just an absolutely monstrous crime." The Legislature could not have envisioned a much worse scenario when it determined that a sentence of up to thirty years is appropriate for the crime of attempted murder. Given the court's findings concerning the "magnitude and ferocity and violence and inhumanity of this crime," its imposition of the maximum allowable sentence for Ward's conduct "is not the rare, extreme, or shocking case" that would offend either the Eighth Amendment or article I, section 9.[5] *See Gilman*, 2010 ME 35, ¶ 24, 993 A.2d at 23.

---

4. We take this opportunity to clarify that article I, section 9 requires a two-part test, in that we look to see whether a particular sentence is greatly disproportionate to the offense for which it is imposed, and if it is not, we then examine whether it offends prevailing notions of decency. Our earlier jurisprudence made it plain that if a punishment fails either part of the test, it is unconstitutional. *See State v. Frye*, 390 A.2d 520, 521 (Me.1978) ("A ... sentence is not cruel and unusual punishment

unless the sentence is greatly disproportionate to the offense *or* the punishment offends prevailing notions of decency.") (emphasis added); *State v. Reardon*, 486 A.2d 112, 121 (Me. 1984) (applying *Frye* test).

5. At oral argument, Ward urged us to conclude that he received a disproportionate sentence by comparing it to sentences imposed in the very limited universe of similar cases in Maine. We are not reviewing the propriety of

■ **[¶ 21]** Ward also argues that his aggregate sentence of fifty years is unconstitutionally disproportionate to his conduct because the State could have charged him with aggravated attempted murder, 17–A M.R.S. § 152–A (2010), a crime that is punishable by any sentence up to life imprisonment. Instead, Ward asserts, the State sought a sentence appropriate to an aggravated attempted murder conviction through consecutive sentences on lesser charges. The trial court rejected that argument:

> I'm not sentencing Mr. Ward for a crime with which he has not been charged.... I'm sentencing Mr. Ward for these three charges, robbery, kidnapping, attempted murder. I've imposed sentences which are within the range of legal sentences for each of those three. Then, I have established the relationship among those sentences and the sequence in which Mr. Ward would serve those sentences, pursuant to the ... provisions of [17–A M.R.S.] [s]ection 1256. So, the fact that there may be another way to look at these crimes would not preclude, in my view, the analysis that I've invoked here.

**[¶ 22]** Ward points to no authority establishing any error in the court's analysis. To the contrary, in *State v. Keene* we observed that "[a] court's decision to require that separate sentences be served consecutively in no way increases the penalties for the individual crimes," and noted that "[c]onsecutive sentences are separate punishments for different offenses, and two sentences do not become a single sentence by virtue of their running consecutively." 2007 ME 84, ¶¶ 25, 26, 927 A.2d 398, 407 (citations omitted). We thus concluded that "a defendant does not have a constitutional right to serve concurrent sentences for multiple violent offenses." *Id.* ¶ 26, 927 A.2d at 408. Ward's constitutional argument concerning the legality of his sentences [6] is limited to a determination of whether each sentence individually is cruel or unusual under the test set forth above. Because we conclude that they are not, it is immaterial that the State could have charged a different crime.

**B. Right to Trial by Jury**

■ **[¶ 23]** Ward next asserts that he was denied his constitutional right to trial by jury when the trial court made factual findings pursuant to 17–A M.R.S. § 1256(2) in deciding to impose consecutive sentences.[7] In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and cases that followed, the Supreme Court held that a jury

Ward's sentence on sentence appeal, however, but rather determining whether it is unconstitutional. The Supreme Court explained that in conducting a disproportionality analysis, "A court must begin by comparing the gravity of the offense and the severity of the sentence. In the rare case in which this threshold comparison ... leads to an inference of gross disproportionality the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction...." *Graham v. Florida*, 560 U.S. ——, ——, 130 S.Ct. 2011, 2022, 176 L.Ed.2d 825, 836 (2010) (alterations omitted) (citation omitted) (quotation marks omitted). As noted above, given these facts, this is not the rare case leading to an inference of gross disproportionality.

6. If we were reviewing the propriety of the overall sentence on sentence review, that review would be for an abuse of discretion in light of the nature of the offense. *See* 15 M.R.S. § 2155(1) (2010); *State v. Downs*, 2009 ME 3, ¶ 29, 962 A.2d 950, 957 ("We ... review a court's determination of the overall sentence for an abuse of discretion."). Because the Sentence Review Panel denied Ward leave to appeal from his sentence, it will stand unless it is illegal.

7. The Sixth Amendment to the United States Constitution and article I, section 6 of the Maine Constitution each guarantee a criminal defendant the right to trial by jury.

must determine any fact, other than the fact of a prior conviction, that increases the maximum punishment for an offense. *See Oregon v. Ice*, 555 U.S. 160, 169, 129 S.Ct. 711, 715, 172 L.Ed.2d 517, 522 (2009). Ward argues that because the maximum punishment for any of his offenses singly was thirty years, and he received an aggregate sentence of fifty years when consecutive sentences were imposed, the facts necessary to justify the consecutive sentences must be found by a jury.

[¶ 24] Both this Court and the Supreme Court have recently held to the contrary. In *Keene*, we concluded that "no constitutional violation occurs as long as the sentence for each individual crime does not exceed the statutory maximum imposed by the Legislature for that crime, even when the aggregate sentence exceeds the maximum sentence for any single crime." 2007 ME 84, ¶ 1, 927 A.2d at 400. At the time *Keene* was decided, we noted that "[t]he United States Supreme Court has yet to reach the question presented here." *Id.* ¶ 22, 927 A.2d at 405, *cert. denied*, 552 U.S. 993, 128 S.Ct. 490, 169 L.Ed.2d 345 (2007).

[¶ 25] Less than two years later, the Supreme Court reached the question and affirmed *Keene's* holding. In *Oregon v. Ice*, the Court, citing Maine among others, noted that "[some] States ... constrain judges' discretion by requiring them to find certain facts before imposing consecutive, rather than concurrent, sentences." *Ice*, 555 U.S. at 164, 129 S.Ct. at 714, 172 L.Ed.2d at 522 & n. 3. The Court announced: "We hold ... that the Sixth Amendment does not exclude [that] choice." *Id.* 555 U.S. at 164, 129 S.Ct. at 715, 172 L.Ed.2d at 522. Applying *Keene*

and *Ice*, the Superior Court's imposition of consecutive sentences did not violate Ward's right to trial by jury.[8]

## C.   Application of 17–A M.R.S. § 1256

■ [¶ 26] Ward finally contends that the trial court imposed an illegal sentence by misapplying 17–A M.R.S. § 1256(2), which required it to consider certain factors before imposing consecutive sentences, and by misapplying 17–A M.R.S. § 1256(3), which prohibits consecutive sentences in certain circumstances.

[¶ 27] The first argument is not cognizable on direct appeal. The court found two independent bases justifying the imposition of consecutive sentences: (1) that Ward's commission of robbery, followed by his commission of kidnapping and attempted murder, represented "different conduct" within the meaning of section 1256(2)(A), and (2) that the unusually serious nature of Ward's criminal conduct satisfied section 1256(2)(D). Those determinations may only be challenged in a sentence appeal pursuant to 15 M.R.S. §§ 2151–2157 (2010). *See* M.R.App. P. 20; *State v. Pineo*, 2002 ME 93, ¶ 11, 798 A.2d 1093, 1098.

[¶ 28] However, Ward also challenges the consecutive sentences imposed by the court as a violation of section 1256(3)(B), an allegation of illegality that is cognizable here. *Pineo*, 2002 ME 93, ¶ 11, 798 A.2d at 1098 ("The imposition of consecutive sentences in violation of section 1256(3)(B) is an illegality that can be raised on direct appeal."); *see also Horr*, 2003 ME 110, ¶ 11, 831 A.2d at 411 ("Even if the circumstances would otherwise justify the imposition of consecutive sentences pursuant to section 1256(2), sections 1256(3)(A)-(D) set

---

8.   Ward invites us to overrule *Keene*, adopt the position of the *Ice* dissent, and hold that the Maine Constitution requires that a jury find any facts necessary to imposing consecutive sentences that collectively exceed the maximum sentence for any single conviction. *See Oregon v. Ice*, 555 U.S. 160, 176, 129 S.Ct. 711, 722, 172 L.Ed.2d 517, 531 (2009) (Scalia, J., dissenting). We decline Ward's invitation.

out circumstances when consecutive sentences may not be imposed.") The trial court considered section 1256(3)(B), which bars consecutive sentences when "[o]ne crime consists only of ... facilitation of[ ] the other," before concluding that it did not apply in Ward's case because his commission of robbery did not facilitate, and was not facilitated by, his commission of kidnapping and attempted murder. 17–A M.R.S. § 1256(3)(B).

[¶ 29] In *Horr*, we explained that "[s]ection 1256(3)(B) was intended to prevent consecutive sentences for offenses which were committed as a part of a single course of conduct during which there was *no substantial change in the nature of the criminal objective." Horr*, 2003 ME 110, ¶ 11, 831 A.2d at 411 (quotation marks omitted). We interpret section 1256(3)(B) narrowly, keeping in mind that "[i]n order to determine whether one crime facilitated another, we properly should focus on the purpose for which the defendant engaged in criminal conduct." *Id.* ¶¶ 15, 17, 831 A.2d at 412 (quotation marks omitted). Even when criminal acts are closely related in time, a court may find that section 1256(3)(B) does not apply when the crimes "involved different motivations." *Id.* ¶ 17, 831 A.2d at 413 (quotation marks omitted).

[¶ 30] Here, Ward robbed the victim at her home in Belfast. At that point he could have taken the cash and the check he stole from her, left her hands duck-taped behind her back, and fled. The robbery was not necessary to, and thus did not facilitate, what followed—the attempted elimination of the witness to Ward's original crime. Having completed the robbery, Ward put the victim in her car, drove her nine miles to a secluded spot, and did everything he could to kill her short of actually accomplishing that intended result.

[¶ 31] Given these facts, the court did not err in finding that there was a "substantial change in the nature of [Ward's] criminal objective," *id.* ¶ 11, 831 A.2d at 411 (emphasis omitted), in that the objective changed from stealing the victim's property to killing her. Furthermore, Ward's motivations for the two sets of crimes were different—the robbery was committed because he desired money, whereas the kidnapping and attempted murder were motivated by a desire to avoid punishment. A crime does not facilitate a later attempt to cover up that crime, nor does an attempted cover-up facilitate what has already occurred. *See State v. Commeau*, 2004 ME 78, ¶ 23, 852 A.2d 70, 76–77 (finding that the continued restraint of a victim following a sexual assault "could not have been executed solely for the purpose of that sexual assault"); *State v. Fleming*, 644 A.2d 1034, 1035–36 (Me. 1994) (finding no error in trial court's conclusion that the rape of a victim did not facilitate subsequent attempted murder because "[the defendant] in fact attempted to murder his victim to cover up his earlier crimes").

[¶ 32] Narrowly construing section 1256(3)(B), *see Horr*, 2003 ME 110, ¶ 15, 831 A.2d at 412, we conclude that the Superior Court properly determined that the statute did not bar the imposition of consecutive sentences under these circumstances. Far from constituting error, the court's careful and thoughtful analysis was not only correct, but commendable.

The entry is:

Judgment affirmed.