2010 ME 45

**STATE of Maine**

v.

**Duane Christopher WATERMAN.**

Supreme Judicial Court of Maine.

Argued: April 14, 2010.
Decided: May 25, 2010.

John S. Jenness, Jr., Esq. (orally), South Paris, ME, for Duane Christopher Waterman.

Janet T. Mills, Atty. Gen., Andrew B. Benson, Asst. Atty. Gen., Donald W. Macomber, Asst. Atty. Gen. (orally), Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SAUFLEY, C.J.

[¶ 1] Duane Christopher Waterman appeals from judgments entered and sentences imposed upon his conviction for two counts of murder, 17–A M.R.S. § 201(1)(A) (2009), following a jury trial in the Superior Court (Oxford County, *Cole, J.*). Waterman contends that (1) there is insufficient evidence to support his convictions; (2) the court abused its discretion when it denied Waterman the opportunity to question witnesses on an alternative suspect theory; (3) the court misapplied principles of law when it set his basic sentences at life imprisonment; and (4) the court abused its discretion when it set his maximum sentences at two concurrent life sentences. We affirm the judgments and the sentences.

## I. BACKGROUND

[¶ 2] Because Waterman challenges the sufficiency of the evidence as well as the court's rulings regarding alternative suspects, we address the facts of this case in detail. Viewing the evidence in the light most favorable to the State, the jury could rationally have found the following facts

beyond a reasonable doubt. *See State v. Elliott*, 2010 ME 3, ¶ 2, 987 A.2d 513, 515–16.

[¶ 3] On July 26, 2008, the body of Tim Mayberry was discovered outside his home in West Paris. A trail of blood extended from his body to the house, where the body of Todd Smith was found. Both Mayberry and Smith died of multiple gunshot wounds, and the subsequent investigation focused on Waterman.

[¶ 4] In the summer of 2008, Waterman lived in Sumner with his wife, their twelve-year-old son, and two younger children. Waterman and his wife were both drug addicts, and to support their drug habits, they dealt drugs and Waterman's wife shoplifted goods.

[¶ 5] Mayberry was a friend of the Watermans with whom they dealt drugs. In June 2008, Mayberry gave them about $3,000 worth of oxycontin pills to resell. Instead of selling the drugs, the Watermans used them and told Mayberry that police had seized them in a drug bust. Mayberry did not believe their story about the drug bust and began pressuring the Watermans to pay him by falsely telling them that he owed the money to "bigger and badder people" who would come after Mayberry and eventually after Waterman and his children. By late July, the Watermans had reduced their debt to Mayberry to approximately $1,500.

[¶ 6] In late June 2008, the Watermans traded stolen goods and cash for a Llama .380–caliber handgun. They kept the bill of sale and the manual for the gun in a safe in their home. Waterman, as a convicted felon, was prohibited from possessing a firearm. *See* 15 M.R.S. § 393 (2009).

[¶ 7] On July 11, 2008, Waterman's wife was arrested and jailed for shoplifting. When she went to jail, she knew that Waterman still had the Llama .380. She believed that Waterman still had the gun a week before the killings because he told her that he had accidentally carried it into a store.

[¶ 8] Shortly after Waterman's wife went to jail, Mayberry and Waterman had a twenty-minute screaming argument over money at a friend's house. After Mayberry left, Waterman said that "Tim was going to pay for what he was doing, treating [me] like that" and "if Tim keeps bugging me about the money I owe him, that, I'm going to kill him."

[¶ 9] Mayberry continued to pressure Waterman to pay his debt. At the same time, Mayberry was more concerned about Waterman's wife "ratting him out" to the police about an unrelated matter. Waterman was angered by Mayberry accusing his wife of being a police informant.

[¶ 10] The week before the killings, Mayberry asked to borrow a gun from a friend, who refused his request. The day before the killings, Waterman went to Mayberry's house; Mayberry hid and would not answer the door. That same day, Mayberry borrowed a twenty-gauge shotgun from another friend.

[¶ 11] At around 7:00 p.m. on July 25, 2008, Mayberry and his friend, Todd Smith, went to Mayberry's house to watch some movies. At approximately 7:30 p.m., Waterman's wife phoned him from jail, and during the recorded conversation, Waterman told her:

> I'm all done with that mother fucker [Mayberry]. You wait. As soon as you're out and I know you're scott free and got your time served, fucking, things are going down.
>
> . . .
>
> My conscience is locked in behind bars. People going to start finding the fucking Chris Waterman of the old days and that's that. I'm all done.

. . .

[T]here's going to be some fucking hurting son of mother fucking bitches out there, I'm telling you right now. I don't care because I ain't scared of doing time.

. . .

I don't give a fuck. It'll be well worth, [inaudible] fucking you know who too. This fucking little pussy. I went and knocked on his door last night and he goes and runs and hides. . . . I'm fucking done. . . . Without my conscience out here, I'm just gonna, ah, who knows? I don't want to say nothing over the phone.

[¶ 12] Between 9:30 and 10:00 p.m., a neighbor driving by Mayberry's house heard a loud bang that could have been a gunshot or a firecracker. Around the same time, another neighbor, lying in bed, heard what sounded like three gunshots or firecrackers.

[¶ 13] At about 10:15 p.m., Waterman's next-door neighbor saw Waterman driving his Jeep with his headlights off up to his house, where he backed into the driveway. There was at least one other person in the car, and Waterman got out of the car yelling, "hurry up, hurry up." The Jeep left five or ten minutes later traveling in the opposite direction from which it came.

[¶ 14] On the morning of July 26, Waterman, with his children in the car, visited Mayberry's house to pick up some prescription medications that he had left there and, ostensibly, to check on him. His twelve-year-old son followed him into the house where they both observed bloodstains in many places. Waterman retrieved his prescriptions, and they left without calling the police.

[¶ 15] At approximately 2:00 p.m.—before the bodies had been discovered—Waterman and his children visited Water-

man's wife in jail. Waterman told her to say that she had sold the Llama .380 handgun and informed her that she would see Tim on the news.

[¶ 16] After 5:00 p.m., people passing in a car noticed Mayberry's body lying on a stone wall near the road. A blood trail extended from the body to Mayberry's house, and there was a tire track in the dirt driveway. State troopers found blood on the floor in the house and discovered Smith's body lying behind a bathroom door. Detectives recovered three .380–caliber shell casings from the living room and made a cast impression of the tire track in the driveway. They also observed that the phone lines to the house had been cut.

[¶ 17] The State Medical Examiner determined that Mayberry and Smith had died of multiple gunshot wounds and retrieved two bullets from Smith's body and three bullets from Mayberry's body. Detectives obtained two spent shell casings from a previous owner of Waterman's Llama .380 and three bullets that the previous owner had fired from the gun. While searching Waterman's house, detectives found three live .380–caliber bullets and the manual for a Llama .380.

[¶ 18] A firearms expert determined that the bullets from the victims' bodies, the shell casings found in Mayberry's living room, and the bullets and shell casings recovered from the previous owner of the Llama were all fired from the same gun, which could have been a Llama .380. The expert also concluded that the bullets from the bodies and the shell casing from Mayberry's house were consistent with the live bullets found at Waterman's house. A physical match expert from the State Police Crime Laboratory concluded that the tire impression cast from Mayberry's driveway was consistent with the right front tire of Waterman's Jeep.

[¶ 19] On August 14, Waterman's wife lied to the grand jury, testifying that she had sold the Llama .380 to Mayberry. Despite her testimony, the grand jury indicted Waterman for the murders of Mayberry and Smith.

[¶ 20] At Waterman's trial in June 2008, his wife admitted that she had lied to the grand jury. Waterman testified that he had sold the Llama .380 to Mayberry after his wife had gone to jail, approximately two to two-and-a-half weeks before the killings, and that he had last seen it on the mantel in Mayberry's living room. He testified that, after the 7:30 p.m. phone conversation with his wife on July 25, he went fishing with his children in Sumner until three or four o'clock the next morning, except that he and the children returned home at one point to pick up lantern fuel, which they had forgotten. Waterman denied having killed Mayberry and Smith. Waterman's twelve-year-old son provided testimony consistent with Waterman's.

[¶ 21] During the trial, Waterman attempted to question another drug dealer, Justin Elsman, on whether he killed Mayberry and Smith. Waterman had established that Elsman was involved in drug dealing with Mayberry and that Elsman knew that another drug dealer had loaned "some money" to Mayberry two days before the killings. Additionally, Waterman argued that because he had sold the Llama .380 to Mayberry, the handgun was available to Elsman at Mayberry's house. The court did not allow Waterman to question Elsman as an alternative suspect at that time, reasoning that he had not yet laid enough of a foundation to make this more than a "fishing expedition."

[¶ 22] Based on this ruling, Waterman did not make an offer of proof to question another drug dealer, William Shrout, as an alternative suspect.

[¶ 23] Waterman was also unable to lay a foundation to question Dolores Paine, a former girlfriend of Todd Smith, as an alternative suspect because she validly invoked her Fifth Amendment privilege against self-incrimination. The court concluded that, even with Paine's limited testimony, any connection between her and the killings was "rank speculation."

[¶ 24] At the conclusion of the State's case-in-chief, Waterman moved for a judgment of acquittal pursuant to M.R.Crim. P. 29(a). The court denied the motion, finding that there was sufficient evidence, if believed by the jury, to sustain the convictions. After a seven-day trial, the jury returned verdicts of guilty on both counts of murder.

[¶ 25] The court held a sentencing hearing on July 30, 2008, at which it denied Waterman's renewed motion for judgment of acquittal pursuant to M.R.Crim. P. 29(b) and motion for a new trial pursuant to M.R.Crim. P. 33. The court then conducted a two-step *Hewey* analysis, setting a basic period of incarceration and then a maximum period of incarceration.[1] *See State v. Hewey*, 622 A.2d 1151, 1154 (Me. 1993). In setting the basic period of incarceration, the court found that two of the *Shortsleeves* factors—premeditation-in-fact and multiple deaths—were relevant. *See State v. Shortsleeves*, 580 A.2d 145, 149–50 (Me.1990). The court found that Waterman had motive to kill Mayberry because of a drug debt and because Mayberry was accusing his wife of being an informant, and that Waterman killed Mayberry with premeditation, based on his phone conversation with his wife a few hours before the

---

1. The third step of the *Hewey* analysis—suspension of part or all of a sentence and imposition of probation—does not apply to convictions for murder. *See* 17–A M.R.S. §§ 1201(1)(A), 1252–C (2009); *State v. Cookson*, 2003 ME 136, ¶ 38, 837 A.2d 101, 112.

killings and the anger and rage in his voice during that conversation. The court noted that Waterman killed Smith for no reason other than to silence a potential witness to Mayberry's murder. Additionally, the court considered Waterman's use of a firearm to be particularly aggravating because he was a convicted felon who was prohibited from possessing a firearm. Finally, the court found that Waterman exercised "incredibly bad judgment" by having his three children in the driveway during the killings because there could have been a shootout. Based on all of these factors, the court determined Waterman's basic sentence to be life imprisonment for each count of murder.

[¶ 26] In setting Waterman's maximum sentence, the court considered aggravating and mitigating circumstances that were personal to Waterman. The court found as aggravating circumstances that Waterman had two prior felony convictions, that he did not testify truthfully at trial, and that the crimes had a profound impact on the victims' families. The court found that the only mitigating circumstances were that Waterman had a family and that he had been a good provider for them until he got involved in drugs. Because the court concluded that the aggravating circumstances outweighed any mitigating circumstances, it did not reduce his basic sentences and sentenced Waterman to serve two concurrent life sentences and to pay $8,594.20 as restitution for the funeral expenses of the victims.

[¶ 27] Waterman timely appealed.[2]

## II. DISCUSSION

### A. Sufficiency of the Evidence

[¶ 28] Waterman argues that the court erred in denying his motion for judgment of acquittal because, based on the facts presented at trial, the jury could not have rationally concluded beyond a reasonable doubt that Waterman committed the two murders.

[¶ 29] We review the denial of a motion for judgment of acquittal by viewing the evidence in the light most favorable to the State to determine whether a jury could rationally have found each element of the crime proven beyond a reasonable doubt. *State v. Standring*, 2008 ME 188, ¶ 12, 960 A.2d 1210, 1212. Circumstantial evidence, even if contradicted by direct evidence, may support a criminal conviction and the proof need not eliminate all alternative explanations of innocence, as long as "the record as a whole supports a conclusion of guilt beyond a reasonable doubt." *State v. Moores*, 2009 ME 102, ¶ 10, 982 A.2d 318, 320 (quotation marks omitted); *State v. Bates*, 2003 ME 67, ¶ 22, 822 A.2d 1129, 1134.

[¶ 30] "A person is guilty of murder if the person ... intentionally or knowingly causes the death of another human being." 17–A M.R.S. § 201(1)(A). At trial, it was undisputed that Mayberry and Smith were dead and that their killings were intentionally or knowingly caused. The issue was whether Waterman caused their deaths.

[¶ 31] Here, the evidence was sufficient for a jury to have rationally found beyond a reasonable doubt that it was Waterman who murdered Mayberry and Smith. Waterman was angry with Mayberry, and he said that he was going to kill him. Shortly after Mayberry's neighbors heard several gunshots, Waterman's neighbor saw him driving his Jeep home

---

**2.** Waterman also applied for leave to appeal his sentence pursuant to M.R.App. P. 20 and 15 M.R.S. § 2151 (2009). The Sentence Review Panel granted his application and we consider his sentence appeal as part of this appeal pursuant to M.R.App. P. 20(h).

with his headlights off and then heard him shouting, "Hurry up, hurry up" to someone. The morning after the killings, Waterman went into Mayberry's house to pick up medication and left without calling the police despite seeing many bloodstains. Before anyone discovered the bodies, Waterman asked his wife to say that she sold the Llama .380 and told her that she would see Mayberry on the news.

[¶ 32] Furthermore, the bullets recovered from the bodies and the shell casings found at Mayberry's house were fired from the same Llama .380 handgun that Waterman had acquired in late June. The live bullets found at Waterman's home also matched the bullets and casings from the bodies and the house, and the tire impression in Mayberry's driveway matched a specific tire on Waterman's Jeep.

[¶ 33] In light of this evidence, the court did not err when it denied Waterman's motions for judgment of acquittal.

### B. Alternative Suspect

[¶ 34] Waterman argues that the court abused its discretion by denying him an opportunity to question Justin Elsman, William Shrout, and Dolores Paine as alternative suspects.

[¶ 35] "We review a trial court's decision to exclude or admit evidence for an abuse of discretion or clear error." *State v. Bridges,* 2003 ME 103, ¶ 39, 829 A.2d 247, 258. "Generally, a criminal defendant may present evidence to support her contention that another is responsible for the crime with which she is charged." *Id.* (citing *State v. Dechaine,* 572 A.2d 130, 134 (Me.1990)). "[E]vidence tending to implicate another person, and deflect guilt from the defendant, must be admitted if it is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability." *State v. Conlogue,* 474 A.2d 167, 172 (Me.1984). To have "sufficient proba-

tive value," admissible evidence incriminating another person "must be more than speculative and conjectural"; it "must be competent and confined to substantive facts which create more than a mere suspicion" in the other person, and it must reasonably establish a connection between the alternative suspect and the crime. *Dechaine,* 572 A.2d at 134 (quotation marks omitted).

[¶ 36] Consequently, when a defendant intends to ask a witness whether the witness committed the crime with which the defendant is charged, the defendant must first provide an evidentiary foundation that supports the question. Whether an alternative suspect committed the crime in question is undoubtedly relevant; however, without a reasonable foundation, the defendant's inquiry would be little more than speculative investigation. *See id.* Ultimately, the court must exercise its discretion in considering whether to allow a question that could elicit relevant evidence, *see* M.R. Evid. 401, 402, but, if based only on speculation, would waste time, mislead the jury, or lead to confusion of the issues, *see* M.R. Evid. 403; *Dechaine,* 572 A.2d at 134 n. 9.

[¶ 37] With respect to Justin Elsman as an alternative suspect, Waterman established that Elsman was involved in drug dealing with Mayberry and that Elsman knew that another drug dealer had loaned "some money" to Mayberry two days before the killings. Waterman did not establish beyond mere suspicion that Elsman had a motive or opportunity to kill Mayberry or Smith. There is no evidence in the record that Elsman knew that Mayberry had substantial quantities of money or drugs that might provide a reasonably plausible motive to kill, or that Elsman had any animus toward Mayberry or Smith. Nor is there any evidence that

places Elsman at Mayberry's house during the killings or credible evidence that connects him to the murder weapon. The mere fact that Elsman knew and interacted with Mayberry is not enough to allow Waterman to question Elsman as an alternative suspect. The court did not commit clear error in finding that the proffered evidence regarding Elsman as an alternative suspect was speculative and conjectural, and it was not an abuse of discretion for the court to exclude it. *See Dechaine,* 572 A.2d at 134.

[¶ 38] Moreover, the court's ruling denying Waterman's request to question Elsman as an alternative suspect was carefully limited. The court explicitly informed Waterman that he could later pursue that line of questioning if he laid a proper factual foundation. Waterman, however, made no further attempt to provide that foundation.

[¶ 39] Although Waterman also assigns error to his inability to name William Shrout as an alternative suspect, this issue was not actually raised at trial. Waterman did not call Shrout as a witness or subject him to voir dire. Through other witnesses, Waterman established merely that Shrout sold drugs to the Watermans and dealt drugs within the same circles as Mayberry. Waterman never attempted to question Shrout as an alternative suspect, and therefore, the court never ruled on the admissibility of that evidence. In the absence of specific evidence suggesting Shrout as an alternative suspect, the court

did not commit clear error or abuse its discretion.

[¶ 40] With respect to Dolores Paine, Waterman concedes on appeal, as he did at trial, that he could not introduce relevant evidence regarding her culpability as an alternative suspect through her own testimony because she validly invoked her Fifth Amendment privilege against self-incrimination.[3] Indeed, Waterman's Sixth Amendment right to compulsory process[4] "does not provide him with an unfettered right to offer testimony that is ... privileged ... under standard rules of evidence." *See State v. Cross,* 1999 ME 95, ¶ 7, 732 A.2d 278, 280 (quoting *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)); *see* M.R. Evid. 501 (recognizing privileges provided by Constitution); Fed.R.Evid. 501 (same).

[¶ 41] Moreover, Paine's unavailability as a witness did not prevent Waterman from introducing other evidence inculpating her. He offered none. As a result, the court determined that there was no evidence placing Paine at the killings and that there was no forensic evidence connecting her to the killings. On this record, the court did not commit clear error when it found that Waterman's proffered question suggesting Paine as an alternative suspect was based on "rank speculation," and it was not an abuse of discretion for the court to exclude the evidence. *See Dechaine,* 572 A.2d at 134.

---

3. The Fifth Amendment provides, "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection against self-incrimination applies to criminal defendants and nonparty witnesses. *State v. Johnson,* 2009 ME 103, ¶ 13, 982 A.2d 320, 324.

4. The Sixth Amendment guarantees a defendant in criminal prosecutions the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The Sixth Amendment also guarantees a criminal defendant the right "to be confronted with the witnesses against him," *id.;* however, Waterman's right to confrontation is not implicated in this case because he had an opportunity to cross-examine Elsman and because Shrout and Paine, having not testified, were not witnesses against him.

## C. Sentence Appeal

[¶ 42] Waterman appeals the imposition of two concurrent life sentences. He argues that the court misapplied sentencing principles when it set his basic sentence at life for each count of murder and that the court abused its discretion in declining to reduce his basic sentence from life imprisonment to a term of years. We review a court's determination of the basic sentence de novo for misapplication of legal principles and its determination of the maximum sentence for abuse of discretion. *State v. Hutchinson,* 2009 ME 44, ¶ 39, 969 A.2d 923, 934; *State v. Gauthier,* 2007 ME 156, ¶¶ 31, 33, 939 A.2d 77, 85.

[¶ 43] The sentence for a conviction of murder can range from twenty-five years to life. 17–A M.R.S. § 1251 (2009). The court imposes a sentence for murder through a two-step process. 17–A M.R.S. §§ 1201(1)(A), 1252–C (2009); *State v. Cookson,* 2003 ME 136, ¶ 38, 837 A.2d 101, 112. In the first step, the court determines the basic period of incarceration "by examining the crime, the defendant's conduct in committing it, and by looking at other sentences for similar offenses." *Cookson,* 2003 ME 136, ¶ 38, 837 A.2d at 112; see 17–A M.R.S. § 1252–C(1). In the second step, the court determines the maximum period of incarceration by considering aggravating and mitigating circumstances peculiar to the defendant. 17–A M.R.S. § 1252–C(2); *Cookson,* 2003 ME 136, ¶ 38, 837 A.2d at 112; *Hewey,* 622 A.2d at 1154.

### 1. Basic Sentence

[¶ 44] "[W]hen the court imposes a basic sentence at or near [the maximum], it does not misapply principle if it finds that the defendant's conduct is 'most serious' as compared to other means of committing the crime within that same range." *Hutchinson,* 2009 ME 44, ¶ 42, 969 A.2d at 935 (quoting *State v. Schofield,* 2006 ME 101, ¶ 11, 904 A.2d 409, 414). In *Shortsleeves,* we listed the nature of the aggravating circumstances that provide a "workable set of criteria for distinguishing life sentences from sentences for a term of years." [5] *Hutchinson,* 2009 ME 44, ¶ 36, 969 A.2d at 934 (quotation marks omitted); *see Shortsleeves,* 580 A.2d at 149–50. The *Shortsleeves* list is neither exhaustive nor all-inclusive. *See State v. Basu,* 2005 ME 74, ¶ 25, 875 A.2d 686, 693 (noting that the sentencing court properly considered the additional factor of murder for pecuniary gain in determining the basic period of incarceration). It identifies some of the most common factors that justify imposing a life sentence and provides a framework for the potential identification of other factors that could warrant the imposition of a life sentence.[6] Although the imposition of a life sentence is not required when *Shortsleeves* circumstances are present, 580 A.2d at 150, the presence of any one of those circumstances can justify a life sen-

---

**5.** The list includes: premeditation-in-fact; multiple deaths; murder involving a person who has been previously convicted of a homicide or a crime involving the use of deadly force; murder accompanied by torture, sexual abuse, or extreme cruelty to the victim; murder committed in a penal institution by an inmate of that institution; murder of a law enforcement officer while in performance of his or her duties; and murder of a hostage. *State v. Shortsleeves,* 580 A.2d 145, 149–50 (Me.1990).

**6.** We acknowledge our stated intention in *Shortsleeves* "to suggest that under the present formulation of our Criminal Code life imprisonment is not justified in the absence of one of these enumerated circumstances." *Shortsleeves,* 580 A.2d at 150. To be clear, any factors in addition to the *Shortsleeves* list must necessarily reflect a judicial and societal recognition that the factors warrant the ultimate penal sanction.

tence, *State v. Wilson*, 669 A.2d 766, 769 (Me.1996); *see also Bates*, 2003 ME 67, ¶ 26, 822 A.2d at 1135.

[¶ 45] Here, the sentencing court found that two of the enumerated *Shortsleeves* aggravating circumstances were present: premeditation-in-fact (at least with respect to Mayberry) and multiple deaths. The court also articulated two other circumstances that increased the seriousness of Waterman's crime: that the murders involved a handgun when Waterman, as a convicted felon, was prohibited from possessing a firearm, and that Waterman placed his three children in danger by having them in his car outside Mayberry's home at the time of the murders. The court acted well within its discretion in considering these aggravating circumstances in addition to those listed in *Shortsleeves*.

[¶ 46] Placing children close to a scene of violence or murder obviously exposes them to risk of physical harm. In addition, children who witness such horrific violence also face adverse neurological, psychological, and developmental consequences.[7] Creating such a severe collateral impact on children is an aggravating circumstance that could raise a defendant's homicidal conduct to "most serious."

[¶ 47] Contrary to Waterman's contention, the court was not required to place his conduct expressly on a continuum with other actual murders as long as its analysis reflected that his crime "was considered to be among the most serious ways in which the crime might be committed." *See Hutchinson*, 2009 ME 44, ¶ 42, 969 A.2d at 935. The court considered the *Shortsleeves* guidelines and thoughtfully addressed other serious factors in determining that Waterman's crimes and his conduct in committing them were serious enough to justify basic sentences of life imprisonment. The court did not misapply sentencing principles in this case. *See Wilson*, 669 A.2d at 769.

2. Maximum Sentence

[¶ 48] "In determining the appropriate degree of mitigation or aggravation of an offender's basic [sentence,] the court may consider any evidence that is factually reliable and relevant." *Hewey*, 622 A.2d at 1154.

[¶ 49] Here, the court found the only mitigating circumstance to be that Waterman was trying to provide for his family. Contrary to Waterman's view, the court did not find Waterman's drug use

---

**7.** *See* David Finkelhor et al., *Children's Exposure to Violence: A Comprehensive National Survey*, Juv. Just. Bull. 2 (2009), *available at* http://www.ncjrs.gov/pdffiles1/ojjdp/227744.pdf (stating that children who are exposed to violence may have "difficulties with attachment, regressive behavior, anxiety and depression, and aggression and conduct problems," and that those children may continue the cycle of violence in their generation); *see generally* Betsy McAlister Groves, *Children Who See Too Much: Lessons from the Child Witness to Violence Project* 30–49 (2002) (discussing the effects of exposure to violence on young children, including effects on early brain development); Melissa Hagan, et al., *Suffolk County Safe & Bright Futures for Children Initiative, Identifying and Meeting the Needs of Children and Adolescents Exposed to Domestic Violence: Final Report* 4–6 (2007), *available at* http://childwitnesstoviolence.org/uploads/Main/SBF_Report_Final_May2007.pdf (discussing how exposure to domestic violence may affect children's emotional, cognitive, and moral development and its association with antisocial behavior, substance abuse, mental illness, and adverse health outcomes in adulthood); Robert S. Pynoos & Spencer Eth, *Children Traumatized by Witnessing Acts of Personal Violence: Homicide, Rape, or Suicide Behavior, in Post–Traumatic Stress Disorder in Children* 17, 19–31 (Spencer Eth & Robert S. Pynoos eds., 1985) (discussing traumatic effects in children who witness acts of violence, including homicide of a parent).

instead it found that his drug use interfered with his ability to provide for his family, and it discussed how drug abuse led to Mayberry's and Smith's deaths. Considering that the court balanced the one mitigating circumstance against the aggravating circumstances of Waterman's two prior felony convictions, his failure to testify truthfully, and the profound impact of his crimes on the victims' families, the court did not abuse its discretion when it sentenced Waterman to two concurrent life sentences.

The entry is:

Judgments and sentences affirmed.