2012 ME 93

**STATE of Maine**

v.

**Colin KOEHLER.**

Supreme Judicial Court of Maine.

Argued: April 12, 2012.
Decided: July 12, 2012.

Peter J. Cyr, Esq. (orally), Law Offices of Peter J. Cyr, Portland, and Richard L. Hartley, Esq., Law Offices of Richard L. Hartley, Bangor, for appellant Colin Koehler.

William J. Schneider, Attorney General, and Donald W. Macomber (orally), Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SAUFLEY, C.J.

[¶ 1] After a jury trial, Colin Koehler was found guilty of the intentional or knowing murder of a young woman he had known for less than a day, and the court sentenced him to life in prison. *See* 17–A M.R.S. §§ 201(1)(A), 1251 (2011). Koehler challenges several rulings on evidence, procedure, motions, and jury instructions. He also challenges his sentence, primarily on the grounds that there was insufficient evidence of premeditation, that he has no substantial criminal history, and that his mental health evaluations failed to reveal any significant psychological or psychiatric disorders linked to criminality. We discern no error in the court's trial rulings, and we conclude that the court acted within its sentencing authority in imposing a life sentence. We affirm the judgment of conviction and the life sentence entered in the Unified Criminal Docket (Bangor, *Anderson, J.*).

## I. BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Severy*, 2010 ME 126, ¶ 3, 8 A.3d 715.

[¶ 3] Colin Koehler first met the victim on the afternoon of August 7, 2009, when his friend, Justin Ptaszynski, brought her to Koehler's apartment. Koehler was then thirty-four years old, and the victim was nineteen. During that afternoon, Koehler had a conversation on his cell phone with Jessica Palmer, who was—or had recently been—his girlfriend. Koehler and Palmer had an argument because Palmer was jealous and angry that the victim, whom she knew, was at Koehler's apartment.

[¶ 4] Later, Koehler came up behind the victim while she was sitting in his apartment and made a stabbing motion toward her with a knife that was in a sheath. He said to Ptaszynski and another friend, "Can you imagine? What if?" The victim did not appear to have heard him and did not react in any way.

[¶ 5] Ptaszynski stayed with Koehler that night. The next morning, Saturday, August 8, the two encountered the victim while walking outdoors, and the three walked to a downtown park in Bangor together sometime before noon. They walked to the river and, after walking for about fifteen minutes, came upon a shack. The victim went inside to look around. Ptaszynski stayed outside. Koehler entered the shack after the victim. After a couple of minutes, Koehler swung a katana knife, with a blade measuring nearly ten inches, through the victim's abdomen. The victim fell on her knees crying, and Ptaszynski saw Koehler stab her in the throat while saying, "Shut the fuck up." The victim died of these multiple sharp-force injuries.

[¶ 6] Soon thereafter, Koehler and Ptaszynski went to a supermarket to return videos that Ptaszynski had in his pocket. A security video from the supermarket shows them doing this. They then went to Koehler's residence, where Koehler cleaned off the knife in his sink. Also that day, Ptaszynski destroyed the soles of his shoes and discarded the shoes in a dumpster behind a friend's apartment.

[¶ 7] The next morning, Sunday, August 9, Koehler went to the Bangor Police Department to ask the police to drop charges that he had lodged a week earlier against Palmer's ex-boyfriend, Kenneth Creamer. At about the time that he was at the police department, he exchanged text messages with Palmer and Creamer. Koehler stated in his messages to Palmer,

"U were still fuckn ken that girl told me it was her last words i warned u what would hapen to anyone that came between us boo," and "Wana see her i dont think anyones found her yet." He sent a text message to Creamer in which he proposed that they meet "under the 395 bridge bangor side," to which Creamer replied, "Sorry but i was trained not to meet my enemy on their ground and terms your gonna have to do better than that." Koehler replied, "To bad [the victim] didnt know that lol." He then sent a text message to Palmer that said, "R u goin to the cops on me." Time-stamped video recordings from the police station show Koehler using the buttons on a cell phone at roughly the same time of day that the text messages were sent.

[¶ 8] Koehler also called Creamer sometime around 11:45 a.m., threatened him, and said that he had killed a woman by stabbing her in the stomach. He told Creamer that she had yelled, "What the fuck?" and that he stabbed her in the throat to shut her up.

[¶ 9] Later in the evening, Palmer visited Koehler and told him that she did not believe that he had killed someone. He told her that he had stabbed the victim in the stomach and she had said, "What the fuck?"

[¶ 10] Palmer and Creamer learned the next day, Monday, August 10, that the victim was dead. They went to the police and turned over their cell phones.

[¶ 11] On the following day, Tuesday, August 11, the police interviewed Ptaszynski and the other friend who was present when Koehler made a stabbing motion behind the victim. Ptaszynski turned over his clothing from the day of the murder, and no blood was found on any of it.

[¶ 12] The police obtained a search warrant for Koehler's residence, and when they arrived there to execute it, they knocked on the door and called Koehler's cell phone repeatedly. They could hear his cell phone ringing inside the apartment, and they saw a face in a window briefly. The Special Response Team used tear gas and entered the apartment. They brought Koehler out barefoot and in handcuffs. The investigating detectives brought him to their unmarked police car and read him his *Miranda* rights. Koehler agreed to talk to them. The detectives took him to the police station and interviewed him for approximately three hours. Throughout the interview—including after being shown a video of him walking with the victim and Ptaszynski—Koehler consistently and calmly denied having seen the victim after the Friday night when he met her.

[¶ 13] In searching Koehler's apartment, the police found a pair of jeans that DNA testing revealed were spattered with the victim's blood. Koehler's DNA was found inside the waist and inner thigh area of the jeans, and Ptaszynski's DNA was not. In Koehler's apartment, the police also found the shirt that Koehler had been wearing, which had red-brown stains on it, and they found two Japanese swords. Between Koehler's box spring and mattress, the police found a sheet of plywood that had a human figure drawn on it. The plywood was scarred with stab and cut marks.

[¶ 14] Based on information from Ptaszynski, the police found a katana knife in a sheath in a retaining wall not far from Koehler's apartment. Koehler later told a fellow inmate at the Penobscot County Jail that he had stabbed and sliced through the victim's throat. He also told the inmate where he had hidden the weapon. A small reddish-brown stain on the knife near the hilt tested presumptively positive for blood, though the sample could not be confirmed as human blood, and no DNA was detected on the swab that was taken.

[¶ 15] Koehler was charged by complaint, and later indictment, with one count of intentional or knowing murder, 17–A M.R.S. § 201(1)(A). Koehler moved to suppress the statements that he made when the police interrogated him as well as the statements that he made to fellow inmates at the Penobscot County Jail.

[¶ 16] After evidentiary hearings on the motions, the court held that Koehler's statements to police during the interrogation were admissible, as were Koehler's statements to two fellow jail inmates. The court granted the motion to suppress a third inmate's testimony.

[¶ 17] Koehler next moved in limine to suppress photographs of the victim's body and evidence of the bladed weapons that were discovered in his apartment. The court denied these motions and also ruled that a photo of the plywood target would be admissible. The matter then proceeded to a five-day jury trial that ran from September 27 to October 1, 2010. During the trial, Koehler made several evidentiary objections that the court overruled.

[¶ 18] Both after the State's case and after his presentation of his own case, Koehler moved for a judgment of acquittal. The court denied each motion notwithstanding Koehler's argument that Ptaszynski had failed to identify him in the courtroom.

[¶ 19] Koehler objected to the reading of the State's requested instruction on accomplice liability on the ground that the State had offered no evidence that Koehler had helped someone else kill the victim. The court gave the instruction because it concluded that the jury could find, if it believed some evidence and not other evidence, that Ptaszynski had the knife and that Koehler was an accomplice in the crime.

[¶ 20] The jury returned a verdict of guilty. Before sentencing, Koehler moved for a new trial based on newly discovered evidence. The court held an evidentiary hearing on the motion at which it heard testimony from another inmate who had been in jail with Koehler.[1] The inmate testified that he spent time with the victim on the morning of her death and that she walked away from him between 11:00 a.m. and 12:00 p.m. Direct examination revealed that he had, at some point before being interviewed by police, stated that he had seen the victim walk away at 11:30 with two or three men, none of whom were Koehler. The court denied the motion for a new trial on the ground that the testimony could not possibly change the outcome of the trial.

[¶ 21] The court then proceeded to sentencing. The presentence investigation report compiled and summarized Koehler's life history and included as attachments (1) Koehler's out-of-state criminal history, (2) his Maine driving record, (3) a psychological evaluation accompanied by a neuropsychological evaluation and a psychiatric evaluation, (4) medical history information, (5) reports concerning Koehler's behavior while in jail, and (6) a recidivism risk-assessment evaluation. The court also received letters and heard statements from the victim's family.

[¶ 22] Koehler had one prior conviction for making terroristic threats, for which he was fined. Otherwise, his convictions were all for traffic-related infractions.

[¶ 23] Koehler's psychological evaluation indicated that he has unrealistic thinking and persecutory ideation. Although he

---

1. The record reflects that this inmate did not share a jail cell with Koehler but did spend time with him in the jail's common areas.

measured low on the psychopathy checklist and was in the lower half of the scale for risk of future violence, testing demonstrated that Koehler poses a risk of future criminality that is equal to or higher than that of 68.4% of inmates. In his psychiatric evaluation, Koehler was diagnosed with attention deficit hyperactivity disorder, marijuana addiction in full remission in a controlled environment, and dyscalculia (an innate difficulty in learning or understanding math and related concepts). Although he had displayed antisocial behaviors and traits, he was not diagnosed with any personality disorder, and the psychiatrist did not believe that his medical history of encephalitis affected his functioning.

[¶ 24] Koehler had a history of difficulties in school, particularly with math. He graduated from high school with average grades and earned an associate's degree in art and design. He held several jobs after graduating but had ceased work and begun to receive disability benefits primarily due to pain arising from Reiter's Syndrome, a form of inflammatory arthritis.

[¶ 25] After being placed in jail, Koehler was written up multiple times. He was found to have passed notes, drawn an inappropriate picture of a prison staff member, trafficked in contraband by filing down a toothbrush to make a sharp instrument, and threatened another inmate. To the extent that he challenged the resulting sanctions through administrative appeals, the sanctions were upheld. Despite his transgressions, Koehler sees himself as a model inmate.

[¶ 26] After considering these sentencing materials and the trial record, the court made the following findings, all of which have support in the record. The murder was premeditated; Koehler brought his knife with him and used it to commit the crime. His motive for the murder—to prove to Palmer that he was not involved with the victim—was "ridiculous" and "senseless." There was no mental health or situational trigger for the killing, and it was not a crime of passion. Koehler placed no value on the victim's life whatsoever. The court set the basic sentence at life.

[¶ 27] The court found, as mitigating factors, that Koehler had no substantial criminal history, had no prior antisocial diagnosis, and had a close relationship with his family. The court found that the lack of any mental health diagnosis was only a limited mitigating factor, however, because Koehler's commission of this crime made it impossible to predict whether he would reoffend; there was no condition to treat or effort that could be made to prevent him from reoffending.

[¶ 28] As aggravating factors, the court found that the victim's family has suffered an enormous loss, that Koehler lacks remorse as evidenced by his nonchalance in the videos taken of him soon after the murder, and that he persuaded others of lower intelligence to lie for him, which demonstrated what little regard he has for others. Based on these factors, the court arrived at a final sentence of life imprisonment. Koehler timely appealed from his conviction, and we granted him leave to appeal from his sentence. *See* M.R.App. P. 2, 20(g), (h).

## II. DISCUSSION

### A. Judgment of Conviction

[¶ 29] Despite Koehler's multiple attacks on the court's evidentiary and trial rulings, we discern no errors. The court did not err or abuse its discretion in (1) admitting in evidence Koehler's statements to police as voluntarily made after waiver of his *Miranda* rights, *see State v. Dodge*, 2011 ME 47, ¶¶ 11, 12, 17 A.3d 128; *State v. Warren*, 2008 ME 154, ¶ 12, 957 A.2d 63; *State v. Nielsen*, 2008 ME 77, ¶ 22, 946

A.2d 382; *State v. Basu,* 2005 ME 74, ¶ 19, 875 A.2d 686; *State v. Lockhart,* 2003 ME 108, ¶¶ 22–24, 33, 830 A.2d 433; *State v. Marden,* 673 A.2d 1304, 1309 (Me.1996); *State v. Cooper,* 617 A.2d 1011, 1013–14 (Me.1992); (2) admitting the testimony of the single jailhouse informant who testified at trial, *see State v. Pettingill,* 611 A.2d 88, 90 (Me.1992); (3) admitting evidence of Koehler's possession of two other Japanese swords and his use of a plywood target, *see State v. Filler,* 2010 ME 90, ¶ 17, 3 A.3d 365; *State v. Ardolino,* 1997 ME 141, ¶ 10, 697 A.2d 73; (4) admitting a photograph of the victim's body, *see State v. Irving,* 2003 ME 31, ¶ 23, 818 A.2d 204; *cf. State v. Conner,* 434 A.2d 509, 512–13 (Me.1981); (5) admitting evidence of a telephone conversation between Koehler and Palmer, *see* M.R. Evid. 602; *State v. Long,* 656 A.2d 1228, 1230 (Me.1995); *State v. Googins,* 640 A.2d 1060, 1062 (Me.1994); (6) excluding evidence that police administered a polygraph to secure a witness's testimony, *see State v. Lavoie,* 2010 ME 76, ¶ 14, 1 A.3d 408; *State v. Burnham,* 427 A.2d 969, 971 (Me.1981); (7) allowing a witness's recollection to be refreshed, *see* M.R. Evid. 612(a); *State v. Hamel,* 2007 ME 18, ¶ 3, 913 A.2d 1287; *see also Cope v. Sevigny,* 289 A.2d 682, 687 (Me.1972); (8) instructing the jury on accomplice liability, *see State v. Caouette,* 462 A.2d 1171, 1175 (Me.1983); (9) denying Koehler's motions for judgment of acquittal, *see Severy,* 2010 ME 126, ¶ 8, 8 A.3d 715; *State v. Cook,* 2010 ME 85, ¶ 7, 2 A.3d 333; or (10) denying Koehler's motion for a new trial based on newly discovered evidence, *see State v. Cookson,* 2003 ME 136, ¶ 29, 837 A.2d 101, *cert. denied,* 543 U.S. 852, 125 S.Ct. 263, 160 L.Ed.2d 85 (2004).

[¶ 30] Accordingly, without further discussion, we affirm the court's entry of the judgment of conviction and its denial of Koehler's post-judgment motions. We now review the court's entry of a sentence of life imprisonment.

## B. Life Sentence

[¶ 31] Koehler contends that the basic sentence was improperly determined because the only factor weighing in favor of a life sentence was premeditation, a finding that was inaccurate, and that the maximum and final sentence resulted from an improper weighing and balancing of the mitigating and aggravating factors. He argues that the killing was "an impulsive act of a confused and distraught lover."

[¶ 32] We review a trial court's sentence for disregard of the relevant sentencing factors or abuse of the court's sentencing power. *State v. Reese,* 2010 ME 30, ¶¶ 22–23, 30, 991 A.2d 806, *cert. denied,* —— U.S. ——, 131 S.Ct. 326, 178 L.Ed.2d 211.

[¶ 33] By statute, a person convicted of murder "shall be sentenced to imprisonment for life or for any term of years that is not less than 25." 17–A M.R.S. § 1251. A sentencing court in a murder case follows a two-step process for determining the sentence. *See* 17–A M.R.S. §§ 1201(1)(A), 1252–C (2011); *State v. Waterman,* 2010 ME 45, ¶ 25 n. 1, 995 A.2d 243 (noting that the usual third step of the sentencing process—suspension of part or all of a sentence and imposition of probation—is inapplicable in murder cases, citing to 17–A M.R.S. §§ 1201(1)(A) and 1252–C). First, the court determines the basic term of imprisonment based on an objective consideration of the particular nature and seriousness of the crime, taking into account the sentencing principles of deterrence, restraint, minimization of correctional experience that may promote future criminality, and the elimination of inequalities in sentencing that are unrelated to legitimate criminological goals. 17–A M.R.S. § 1252–C(1); *Reese,* 2010 ME 30, ¶ 18, 991 A.2d 806; *see* 17–A M.R.S. § 1151(1), (3), (5) (2011). Second, the court sentencing for a murder conviction

determines the final period of incarceration based on the relevant aggravating and mitigating factors, additionally taking into account sentencing principles related to rehabilitation, restitution, and differentiation of sentences to account for the individual circumstances of the defendant and to achieve a just outcome. 17-A M.R.S. § 1252-C(2); *Reese*, 2010 ME 30, ¶ 19, 991 A.2d 806; *see* 17-A M.R.S. § 1151(1), (2), (6) (2011); *see also Waterman*, 2010 ME 45, ¶ 25 n. 1, 995 A.2d 243.

■ [¶ 34] A court may set a basic sentence of life in prison only if the murder is accompanied by one or more aggravating circumstances. *See State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me.1990); *State v. Wilson*, 669 A.2d 766, 768-69 (Me. 1996). Although we did not, in *Shortsleeves*, identify all possible aggravating circumstances, *see Waterman*, 2010 ME 45, ¶ 44, 995 A.2d 243, we did hold that one significant aggravating circumstance is premeditation-in-fact, meaning a planned, deliberate killing, *Shortsleeves*, 580 A.2d at 149-50.

■ [¶ 35] Next, in examining aggravating and mitigating factors, a court may also consider the following: whether a defendant has an antisocial, hostile, unstable, or psychopathic character, *id.* at 150; the defendant's age, intelligence, and prior criminal history, *id.* at 150-51; the defendant's susceptibility to rehabilitation, *id.* at 150; the defendant's lack of remorse, *State v. Wood*, 662 A.2d 908, 913 (Me.1995); *Shortsleeves*, 580 A.2d at 150; and the defendant's refusal to take responsibility, *State v. Gauthier*, 2007 ME 156, ¶ 33 n. 7, 939 A.2d 77; *State v. Bates*, 2003 ME 67, ¶ 27, 822 A.2d 1129.

■ [¶ 36] Regarding the basic period of incarceration, the court found, and the record supports, that although Koehler had no reason to have a grudge against the victim, he premeditated the murder, even signaling the possibility to Ptaszynski and another friend the day before, and carried it out, without passion or provocation, to prove something to Palmer.

[¶ 37] In its weighing of aggravating and mitigating factors, the court found that, although the lack of any psychological indicators constituted a mitigating factor, the weight of that evidence was limited given the senselessness of Koehler's decision to murder the victim. The court found that this fact made predicting re-offense impossible, and it found as aggravating factors that Koehler lacked remorse, was nonchalant about the gravity of the crime, was willing to persuade and pressure others to lie for him, and committed a crime that resulted in the victim's death and had a devastating impact on her family. Given these findings and the voluminous supporting evidence offered at trial and at sentencing, the court did not disregard the relevant sentencing factors or abuse its sentencing power in determining that the identified aggravating factors outweighed the mitigating factors of his attachment to his family and his lack of significant prior antisocial behavior. The court did not disregard the relevant sentencing factors or abuse its sentencing power in setting a final sentence of life imprisonment. *See Shortsleeves*, 580 A.2d at 149-50.

[¶ 38] Faced with the senseless, unprovoked, cold-blooded murder of a young woman by a defendant who showed a chillingly remorseless response to his own act, the court's ultimate decision that Koehler should never be at liberty in society again is fully supported in Maine law.

The entry is:

Judgment and sentence affirmed.