MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 31
Docket:        Cum-13-112
Argued:        January 15, 2014
Decided:       February 25, 2014

Panel:         SAUFLEY, C.J., and LEVY, SILVER, <u>MEAD</u>, GORMAN and JABAR, JJ.

STATE OF MAINE

v.

JOEL A. HAYDEN

MEAD, J.

[¶1]  Joel A. Hayden appeals from a judgment of conviction entered by the trial court (*Mills, J.*) on a jury verdict finding him guilty of two counts of knowing or intentional murder, 17-A M.R.S. § 201(1)(A) (2013).  On appeal, Hayden argues that the evidence presented at trial was insufficient to support the jury verdict, that the court misapplied sentencing principles, and that the court abused its discretion when it determined that aggravating and mitigating factors did not require a departure from the basic sentence.  Because we conclude that the evidence was sufficient for the jury to find all of the elements of the crime charged and that the sentencing court neither misapplied sentencing principles nor abused its discretion, we affirm the judgment and sentence.

2

## I. BACKGROUND

[¶2]  Joel A. Hayden and Renee Sandora met in 2003.  Four children were born to them between 2004 and 2009.  Hayden and Sandora had a hostile relationship that was characterized by fighting, jealousy, and Hayden's use and sale of illegal drugs.  Hayden was addicted to cocaine, Xanax and Oxycontin, and sold cocaine and crack cocaine.  In June 2011, he spent a month in a rehab facility, but began using drugs again shortly after he was released.  Hayden was also an extremely jealous man.  He made numerous apparently baseless accusations of infidelity against Sandora, including claims that her neighbor was sneaking men into the basement of their apartment complex for Sandora to meet; that a close friend's husband was sleeping with Sandora; and that Sandora's mother had taken her—while Sandora was confined to a wheelchair and two days after she had given birth to twins—to meet a man at Wal-Mart.

A.    The Shooting

[¶3]  In July 2011, Hayden and Sandora's relationship became even more tumultuous.  They were fighting frequently and Sandora communicated to Hayden that she wanted him to move out of her home in New Gloucester.  Trevor Mills, a childhood friend of Hayden's who had often helped the couple work through their relationship problems, traveled from Massachusetts to visit with them at their request.  He drove to Maine in his mother's black Cadillac.

[¶4]  On July 25, Mills, who had arrived in Maine a number of days earlier, left Sandora's home to pick up take-out food.  When he returned, Hayden shot him as he stood near a sliding-glass-door entrance to the house.  The force of the shot drove Mills through the glass door, which shattered as he crashed into it.  Hayden shot Mills again as he lay on a deck outside the door.

[¶5]  Just before Hayden shot Mills, Sandora fled the home with their children.  After escaping the house, she managed to load the three youngest into her car, but the eldest child remained outside the car on the lawn nearby.  Sandora then called 911 on her cell phone and reported that Hayden had just shot his friend, that he was going to kill her in front of her kids, and that she could not drive away because her car keys were inside the house.  The phone call lasted twenty seconds.  Before the line was disconnected, she stated, "What are you going to do, kill me? Stop."

[¶6]  After shooting Mills, Hayden walked the short distance to the lawn where Sandora was standing and shot her in full view of their eldest son.  Their three other children were just feet away, sitting in the back seat of Sandora's car.  A neighbor heard the shots, exited her home, and saw a man driving away in a large black car.  She went over to Sandora's home and found a child running around the driveway screaming, "He shot them."  Both Mills and Sandora were alive when police arrived at the scene but died the next day in the hospital.

4

[¶7]   After police secured the scene, they issued an all-points bulletin for Hayden indicating that he had last been seen driving a black Cadillac.  Later that evening, a toll collector on the Maine Turnpike reported that a vehicle matching the description of the Cadillac had passed through a toll plaza.  The Maine State Police located and tailed the vehicle, following it when Hayden exited the turnpike toward Saco.  After Hayden failed to comply with a trooper's signal to stop, a high-speed chase ensued.  Followed by the Maine State Police, Hayden sped through Biddeford and Saco, reaching speeds of over 105 miles per hour. The chase ended when Hayden crashed the Cadillac into a ditch in Lyman.  He was handcuffed as soon as he exited the vehicle.

B.     Events Preceding the Shooting

[¶8]  A couple of days before Hayden shot Sandora and Mills, he went target shooting with his mechanic.  Hayden and the mechanic drove to a local department store where the mechanic purchased ammunition for Hayden's gun, a pistol that the mechanic identified as a .45 caliber handgun manufactured by Colt.

[¶9]  On July 24, the day before the shooting, Hayden visited the home of a frequent drug customer to sell crack to her brother.  While he was at her house, he told the customer that he and Sandora had been fighting and that their relationship was over.  He stated that he was "going to catch her with [Mills]" and that "I'm going to kill that bitch and I'm going to get [Mills], too.  I'm going to catch him."

The customer saw Hayden take a black handgun from underneath the seat of his car and ask her brother to clean it for him in exchange for crack. The same day, Hayden asked both the customer's brother and the mechanic to help him procure ammunition for the gun.

C.    Forensic Evidence

[¶10] Police investigators found nine spent .45 caliber shell casings and a sock containing ten unfired rounds at Sandora's home. Both the casings and the unfired rounds were the same type and brand of ammunition.[1] The shell casings— three of which were found inside the house, and six of which were found outside— were all fired from the same gun. A number of fired bullets were also recovered at Sandora's home—two in the deck underneath where Mills was found, embedded in the wood; another in the screen door; and a fourth in the ground under the deck. Three of these bullets came from the same gun that fired a bullet recovered from Mills's body during autopsy. Impact damage to the fourth bullet found outside the house prevented a conclusive determination as to its firing origin. The ballistics expert concluded that the bullets were .45 caliber and that it was likely that they were fired from a semi-automatic pistol.

---

[1]    The ammunition was identified as "Remington full metal jacket" made for a .45 caliber semi-automatic.

[¶11]  On September 9, 2012, a grand jury indicted Hayden on two counts of intentional or knowing murder, 17-A M.R.S. § 201(1)(A).  Hayden entered pleas of not guilty and his trial began on January 7, 2013.  On January 14, the jury returned a verdict of guilty on both counts.  The court imposed two concurrent sentences of life imprisonment.  Hayden appealed the court's judgment on the jury verdict.  He also requested, and was granted, leave to appeal his sentence.

## II.  DISCUSSION

### A.    Sufficiency of the Evidence

[¶12]   When a defendant challenges the sufficiency of the evidence on appeal, we view the evidence in the "light most favorable to the State to determine whether a fact-finder could rationally find beyond a reasonable doubt every element of the offense charged."  *State v. Cook*, 2010 ME 81, ¶ 7, 2 A.3d 313 (quotation marks omitted).   The jury is "permitted to draw all reasonable inferences from the evidence" and "is free to selectively accept or reject testimony presented based on the credibility of the witness or the internal cogency of the content."  *State v. Williams*, 2012 ME 63, ¶ 49, 52 A.3d 911 (quotation marks omitted).

[¶13]  In this case, the evidence against Hayden, including evidence that he acted intentionally or knowingly, was overwhelming.  Viewed in the light most favorable to the State, the evidence shows that Hayden was target shooting with a

.45 caliber Colt pistol in the days leading up to the shooting, that he told a witness that he was going to kill Mills and Sandora the day before he did so, and that Sandora told the 911 dispatcher that Hayden had killed Mills and was going to kill her in front of her children. The evidence also shows that bullets recovered from the scene were consistent with being fired from a .45 caliber Colt pistol—a weapon that Hayden was seen with in the days leading up to the murders. Finally, Hayden and Sandora's oldest child took the witness stand and testified that he saw his father kill Sandora in front of him. This evidence is more than sufficient for the jury to find all of the elements of knowing or intentional murder beyond a reasonable doubt.

[¶14] Hayden argues that evidence of his ongoing drug addiction and drug use requires a conclusion that the evidence was only sufficient for the jury to find him guilty of manslaughter—not knowing or intentional murder. He points to lab tests that he contends indicate he was under the influence of cocaine and a variety of prescription painkillers at the time of the killings.

[¶15] At trial, both parties agreed that the only evidence of Hayden's intoxication was the testimony of a chemist from the Maine Health and Environmental testing lab.[2] The chemist testified that Hayden tested positive for a

---

[2] At trial, the parties disagreed as to whether the defense of intoxication had been raised. The State ultimately conceded that, taken in the light most favorable to Hayden, the evidence was sufficient to raise

number of substances including cocaine, marijuana, hydrocodone and oxycodone, but that blood levels for all of the substances except oxycodone were low. Hayden's oxycodone levels were described as "very high," but the State presented evidence that Hayden had taken these drugs after he fled the scene.

[¶16]  Evidence of intoxication may raise a reasonable doubt as to the existence of a required culpable state of mind.  17-A M.R.S. § 37(1) (2013).  But when a defendant presents evidence of voluntary intoxication—as opposed to involuntary intoxication—the State is not required to disprove intoxication beyond a reasonable doubt.  *State v. Gallant*, 2004 ME 67, ¶ 3, 847 A.2d 413.  Instead, evidence of intoxication is merely a factor to be considered alongside other evidence relevant to a defendant's state of mind.  *See id.*  In this case, the jury was free to, and did, reject Hayden's theory that his state of mind was affected by his drug use.  *See Williams*, 2012 ME 63, ¶ 49, 52 A.3d 911.

B.    The Court's Sentencing Analysis

[¶17]  In a murder case, the sentencing court uses a two-step process.  *State v. Waterman*, 2010 ME 45, ¶ 43, 995 A.2d 243.  In the first step, the court determines the basic period of incarceration, and in the second, the maximum period of incarceration.  *Id.*  We review a sentencing court's "determination of the

---

the defense.  *See State v. Michaud*, 513 A.2d 842, 850 (Me. 1986).  The jury received an intoxication instruction.

basic sentence de novo for misapplication of legal principles and its determination of the maximum sentence for abuse of discretion." *Id.* ¶ 42.

1.      The Basic Period of Incarceration

[¶18]  The basic period of incarceration is determined "by considering the particular nature and seriousness of the offense as committed by the offender." 17-A M.R.S. 1252-C(1) (2013).  The sentencing court examines "the crime, the defendant's conduct in committing it, and [looks] at other sentences for similar offenses." *Waterman*, 2010 ME 45, ¶ 43, 995 A.2d 243.  "When a court imposes a basic sentence at or near the maximum, it does not misapply [sentencing] principle[s] if it finds the defendant's conduct most serious as compared to other means of committing the crime within that same range."  *Id.* ¶ 44.  If a court imposes a life sentence, as opposed to a term of years, it can use the list of aggravating factors we adopted in *State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990), as a guide to distinguish between the two types of sentences. *Waterman*, 2010 ME 45, ¶ 44, 955 A.2d 243.  The *Shortsleeves* list, however, is "neither exhaustive nor all-inclusive."    *Waterman*, 2010 ME 45, ¶ 44, 955 A.2d-243.

[¶19]  In arriving at the maximum sentence, the sentencing court compared the facts of this case to a number of prior cases where sentencing courts have imposed a basic period of incarceration of life in prison.  The cases the court found

most helpful were *State v. Cookson*, 2003 ME 136, ¶ 44, 837 A.2d 101 (holding that the extreme cruelty, planning, and execution of the murders constituted unusually serious conduct), *Waterman*, 2010 ME 45, ¶ 46, 995 A.2d 243 (holding that placing children close to a scene of violence or murder can raise a defendant's homicidal conduct to "most serious"), and *State v. Holland*, 2012 ME 2, ¶ 40, 34 A.2d 1130 (holding that the defendant's selective execution of his victims could be considered to be among the most serious ways in which the crime might be committed). In the context of these cases, the court found the murders of Mills and Sandora to be among the most serious ways the crime might be committed and sentenced Hayden to a basic period of incarceration of life on each count. The court also identified three of the *Shortsleeves* factors that it found were present: premeditation-in-fact, multiple victims, and extreme cruelty with regard to one of the victims. This thorough analysis and determination was not a misapplication of sentencing principles. *See Waterman*, 2010 ME 45, ¶¶ 42-47, 995 A.2d 243.

2.    The Maximum Period of Incarceration

[¶20]   In determining the maximum period of incarceration, a sentencing court should consider all relevant factors not taken into account in the basic sentence, which "include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest." 17-A M.R.S. 1252-C(2) (2013).

[¶21] In this case, the court found that there were ten aggravating factors: the impact on the victim and the victim's family, Hayden's refusal to take responsibility—and as a result forcing his son to testify against him, Hayden's lack of remorse, his prior criminal history, his volatile unstable character, his history of substance abuse, the likelihood that he will reoffend, and the need to protect the public interest. The court found only one mitigating factor, the nature and existence of the Hayden's family support, which it determined was of minimal significance.

[¶22] Hayden challenges only two of the aggravating factors found by the court. He argues that the court abused its discretion when it found that he would reoffend and when it considered, as an aggravating factor, the fact that he took his case to trial with the knowledge that his eight-year-old son would have to testify against him. Hayden's first argument is easily dismissed. He has an extensive criminal record that the court could consider as raising the probability that he would reoffend. *See State v. Berube*, 1997 ME 165, ¶ 13, 698 A.2d 509. His second argument, however, raises a more complex issue.

[¶23] Every criminal defendant must be able to exercise his or her constitutional right to a trial by jury without fear of a more severe sentence for doing so unsuccessfully. *State v. Grindle*, 2008 ME 38, ¶ 15, 942 A.2d 673; *State v. Farnham,* 479 A.2d 887, 891 (Me. 1984). We have vacated sentences imposed

in violation of this principle. *See, e.g.*, *State v. Dansinger*, 521 A.2d 685, 690 & n.7 (Me. 1987); *State v. Sutherberg*, 402 A.2d 1294, 1296-97 (Me. 1979). But we have also stated that "[t]here is a clear-cut distinction between enhancing a sentence because the convicted defendant insisted on a trial and considering that fact along with others in assessing . . . [a] defendant's claim of remorse and reform at the time of sentencing." *Farnham*, 479 A.2d at 893.

[¶24]  In *Farnham,* we addressed an argument that was nearly identical to Hayden's—that a sentencing decision that considers a defendant's election to have a trial—even if it means subjecting a young and vulnerable witness to the trauma of testifying, an event that could be avoided with a guilty plea—violates the defendant's constitutional right to a trial. *Id.* at 889-91. In that case, we held that a sentencing court's reference to the defendant's decision to go to trial must be evaluated "in the context of all the other factors enumerated by the [court] in drawing an individualistic picture of the person to be sentenced." *Id.* at 891. Taking the sentencing transcript as a whole, we concluded that the sentencing court did not punish the defendant for insisting on his right to a trial, but appropriately considered that factor as relevant to the full assessment of the defendant's contrition and remorse and his prospects for rehabilitation. *Id.*

[¶25]  We reach the same conclusion here. Standing alone and taken out of context, the court's statement that "the evidence in this case was overwhelming,

and [Hayden] forced [his son] to testify in a courtroom packed with strangers," could be perceived as an unconstitutional punishment of Hayden for exercising his right to a trial by jury. The court's comment, however, was made in the larger context of a reference to a counselor's review of several factors that contributed to the child's psychological trauma and the court's apparent rejection of Hayden's claim that he loved his son.[3] Accordingly, when the court's statement is reviewed in this larger context of the entire sentencing process, and considering the numerous other aggravating factors listed by the court—many of which, by themselves, could justify the maximum sentence—we find no likelihood that the court impermissibly or unconstitutionally imposed a sentence that was more severe based upon Hayden's exercise of his right to a trial.

The entry is:

Judgment affirmed.

**On the briefs:**

Clifford B. Strike, Esq., and Sarah A. Churchill, Esq., Strike, Goodwin & O'Brien, Portland, for appellant Joel Hayden

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

---

[3] As the child stepped down from the witness stand, Hayden cried out, "Daddy loves you." The court commented on Hayden's outburst during sentencing, suggesting to him that "actions speak louder than words."

**At oral argument:**

Clifford B. Strike, Esq., for appellant Joel Hayden

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine

Cumberland County Unified Criminal docket number CR-2011-4876
FOR CLERK REFERENCE ONLY