MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2013 ME 69
Docket:      Lin-12-334
Argued:      April 9, 2013
Decided:     July 30, 2013

Panel:       SAUFLEY, C.J., and SILVER, MEAD, GORMAN, and JABAR, JJ.

STATE OF MAINE

v.

GREGORY W. VROOMAN

SAUFLEY, C.J.

[¶1]  Gregory W. Vrooman appeals from judgments of conviction on four counts of unlawful sexual contact (Class C), 17-A M.R.S. § 255-A(1)(E) (2012), four counts of unlawful sexual touching (Class D), 17-A M.R.S. § 260(1)(C) (2012), and four counts of assault (Class D), 17-A M.R.S. § 207(1)(A) (2012) entered by the court (*Hjelm, J.*) after a jury trial.  Vrooman challenges the court's denial of his motion to suppress evidence obtained during the execution of a search warrant on his home computer.  He also contests the court's admission of testimony concerning sexually suggestive websites that he viewed on his home and work computers.  We affirm the judgment.

I.  BACKGROUND

[¶2]  In February 2011, the State indicted Vrooman for multiple offenses of unlawful sexual contact, unlawful sexual touching, and assault, as well as one

count of tampering with a witness or informant (Class C), 17-A M.R.S. § 454(1)(A)(2) (2012), all related to allegations that he had sexually assaulted his fiancée's daughter. Vrooman pleaded not guilty to all charges. He filed a motion to suppress and a motion in limine seeking to prevent the admission of evidence obtained through a warrant-based search of his computer and other evidence related to his viewing of pornography. The court denied the motion to suppress. It granted in part and denied in part the motion in limine. A three-day jury trial was held in April 2012. The jury acquitted Vrooman on the tampering charge and found him guilty on all other charges.

[¶3] Viewed in the light most favorable to the State, the following facts rationally support the verdict. *State v. Dolloff*, 2012 ME 130, ¶ 3, 58 A.3d 1032. Vrooman first met Angela Harrison, the mother of the victim, in Rockland in 2005. Soon thereafter, they began dating, and they became engaged in 2008. Harrison had two children from a prior marriage: the victim and her younger brother. At the time that Vrooman and Harrison began their relationship, Harrison's children were in foster care in Massachusetts.[1]

[¶4] In October 2006, Harrison successfully reunified with her children, who moved to Maine to live with her. When Harrison regained custody, her daughter, the victim, was nine years old, and her son was six years old. Harrison

---

[1] The Massachusetts Department of Health and Human Services took custody of the victim and her brother in 2001.

and Vrooman eventually decided to build a house and move in together with the children. The victim was twelve years old when the family moved into the new house in mid-October 2009. The victim and her brother each had their own rooms, which were located at the opposite end of the house from the master bedroom where Vrooman and Harrison slept.

[¶5] Vrooman would sometimes look at pornography on the desktop computer located in the master bedroom. Vrooman's "porn issue" bothered Harrison and resulted in personal tension between them. On one occasion, the victim's brother walked into the master bedroom and witnessed Vrooman looking at pornography on the desktop computer. Vrooman, a Maine State Police Trooper, also viewed sexually suggestive websites on his State Police laptop. In early November 2010, Vrooman conducted Internet searches on his desktop computer using the search term "Teen Dancing" and on his laptop using the terms "You Tube Teen" and "Teen Dancing." He viewed webpages, with web addresses that included terms such as "Hot-Slutty-Teen-Dancing," that depicted, among other things, sixteen- to twenty-five-year-old females dancing provocatively in their underwear.

[¶6] Soon after moving into the new house in October 2009, Vrooman began visiting the victim's bedroom wearing only his underwear and a T-shirt. Describing the first incident, the victim testified that, while she was sitting or lying

4

face-up on her bed, Vrooman straddled her and put his hands under her bra and underwear and touched her breasts and genitals.

[¶7]  The victim testified that these incidents occurred five or six times while she lived at the new house.  During the subsequent incidents, the victim attempted to stop Vrooman from touching her by lying on her stomach.  She was unsuccessful because, as she testified, he would "forcefully shove his hands under me and then put them in my pants."  His hands would go under the victim's shirt and bra, touching or grabbing her breasts.  Vrooman would tell the victim to be quiet to prevent Harrison from hearing anything or waking up.  These incidents made the victim feel "[u]ncomfortable, confused, scared," and "lost."

[¶8]  The victim's younger brother saw Vrooman on top of the victim in the victim's bed on two occasions.  On one occasion, the boy looked through an opening in his sister's closed door and saw Vrooman on top of his sister's waist with his "knees . . . on her arms so they couldn't move."  He believed that Vrooman was tickling his sister.  When he opened the door, Vrooman "pulled his hands away really fast."  On another occasion, the victim's brother witnessed Vrooman on top of the victim and the victim's "shirt was pulled up and his hands were on her stomach."

[¶9]  In November 2010, the victim told a friend about Vrooman's actions. The friend shared the victim's account of the events with her counselor, who then

reported this conversation to the Department of Health and Human Services. That report led to the charges and Vrooman's eventual convictions. The court sentenced Vrooman to five years' incarceration with all but twenty-one months suspended and four years of probation on the counts of unlawful sexual contact. Vrooman also received a concurrent sentence of 364 days in jail on the counts of unlawful sexual touching and assault. Vrooman appeals from those convictions.

## II. DISCUSSION

### A. Motion to Suppress

[¶10] Vrooman first challenges the court's denial of his motion to suppress the evidence obtained from his computer pursuant to a search warrant issued on December 8, 2010. He argues that the warrant was not supported by probable cause and that the jurat of the warrant affidavit was defective.

[¶11] We review the court's denial of Vrooman's suppression motion "for clear error as to factual issues and de novo as to issues of law." *State v. Gurney*, 2012 ME 14, ¶ 30, 36 A.3d 893. "We uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Drewry*, 2008 ME 76, ¶ 19, 946 A.2d 981 (quotation marks omitted).

[¶12] We first address Vrooman's probable cause challenge, reviewing directly "the finding of probable cause made by the judicial officer who issued the warrant, affording that finding great deference," and drawing all reasonable

6

inferences to support that finding. *State v. Nigro*, 2011 ME 81, ¶ 26, 24 A.3d 1283 (quotation marks omitted). "Probable cause is established when, given all the circumstances set forth in the affidavit before [the judicial officer], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (alteration in original) (quotation marks omitted). "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *State v. Ward*, 624 A.2d 485, 487 (Me. 1993) (quotation marks omitted).

[¶13]  The affidavit in support of the warrant included representations that Vrooman claimed that he unintentionally touched the victim's breasts and put his hand down her pants only to give her a "wedgie"; that he used his home and work computers to view sexually suggestive images of young women, including some who appeared to be teenagers; and that he had an issue with pornography and had obtained counseling to address it.  The motion court reasoned that, even if the images viewed by Vrooman on his home computer were not "inherently illegal," those images were "arguably probative of the absence of mistake or accident" as required for the admission of evidence of past wrongful conduct pursuant to Maine Rule of Evidence 404(b).

[¶14]    Contrary to Vrooman's argument, the search warrant affidavit contained evidence sufficient to support a finding that there was a fair probability that evidence of the alleged crimes—specifically, evidence that Vrooman acted intentionally when he touched the victim—would be found on Vrooman's home computer.  *See* 17-A M.R.S. §§ 207(1)(A), 255-A(1)(E), 260(1)(C); *Gurney*, 2012 ME 14, ¶ 32, 36 A.3d 893; *Nigro*, 2011 ME 81, ¶ 26, 24 A.3d 1283.

[¶15]  Turning to the defective jurat, Vrooman did establish that the affidavit contained an error in its identification of the officer who swore to the information articulated in the affidavit.  Specifically, the identification of the averring officer was at odds with the affiant named in the jurat.  The introductory portion of the affidavit indicated that Detective Peter Lizanecz swore under oath to the facts supporting probable cause, and the signature on the affidavit appears to be that of Detective Lizanecz.  The jurat, however, reads, "Appeared before me under oath on this date *the above-named Sgt. Glenn Lang* and signed and swore to the truth of the facts contained in the foregoing instrument."  (Emphasis added.)

[¶16]   The court held a nontestimonial hearing on the challenge to the warrant raised in the motion to suppress, and neither party asked the court to take testimony on the apparent error in the jurat.  The best practice would be to offer the brief testimony of the swearing detective or an affidavit from him indicating that the signature was his and not the signature of Lang.  However, neither party

actually challenged the fact that Lizanecz signed the affidavit. Accordingly, the court found that Lizanecz, not Lang, was the affiant who swore to the truth of the information supporting the warrant application. There is no error in that finding, and once the court determined that the person who was initially named as the affiant and the person who swore to the truth of the facts in the affidavit were the same person, it did not err in concluding that the clerical error in the jurat did not affect the validity of the warrant. *See Gurney*, 2012 ME 14, ¶ 30, 36 A.3d 893; *Drewry*, 2008 ME 76, ¶ 19, 946 A.2d 981; *Ward*, 624 A.2d at 487; *cf. State v. Johnson*, 2009 ME 6, ¶¶ 7, 18, 962 A.2d 973 (holding that an imperfect property description did not undermine the validity of a warrant); *Herrick v. Theberge*, 474 A.2d 870, 874 (Me. 1984) (upholding the validity of an affidavit in support of attachment despite a "sloppily prepared" jurat).

[¶17] Thus, the court did not err in denying Vrooman's motion to suppress.

B. Evidentiary Rulings

1. Pretrial Motions

[¶18] Both parties filed motions in limine in early April 2012. The State sought to offer testimonial and visual evidence of Internet searches and websites visited by Vrooman on his home and work computers. Vrooman moved to exclude, pursuant to Maine Rule of Evidence 403, any evidence of him having an "issue with" or viewing pornography. Pursuant to Maine Rules of Evidence 401,

403, and 404(b), he also requested that the court exclude evidence pertaining to images taken by police from his "workplace or home computers showing teenage girls either partially nude or otherwise."

[¶19]   At a consolidated nontestimonial hearing, the State argued that the evidence gathered from the home and work computers should be admitted—primarily through the testimony of Special Agent Matt Fasulo, who conducted the forensic investigation of the computers—to show Vrooman's motive, lack of misunderstanding or mistake, and intent to commit the charged offenses.  Fasulo would testify that the images found on Vrooman's computers depicted what appeared to be teenage girls, and the State would offer further evidence of the lack of mistake by publishing to the jury an image entitled "Teen Dancing" that showed a young female dancing in her underwear and appeared to have been filmed by a webcam in a bedroom.

[¶20]   Vrooman argued that the evidence of Internet searches and images was highly prejudicial and unrelated to the victim and the alleged conduct underlying the charged offenses.  Vrooman also argued against admitting evidence that he generally had an "issue with pornography" or that he had agreed to attend counseling with Harrison because this issue bothered her.

[¶21]   The court determined that the specific evidence regarding images of teens or young women was relevant and admissible pursuant to Rules 401 and

10

404(b) to show absence of mistake and intent. Performing a pretrial Rule 403 analysis, the court limited the evidence to a testimonial recitation regarding the images of teenagers or young women. To minimize the potential prejudice, the court ruled that the actual website images would not be allowed in evidence unless, at trial, a significant question arose about the nature of the searches or the material found on the computer.

[¶22]  Ultimately, in its pretrial ruling, the court noted that the images themselves were "not inherently illegal," which reduced their prejudicial effect, and the court concluded that the testimonial evidence was not unfairly prejudicial pursuant to Rule 403. Making clear the preliminary nature of its pretrial rulings, the court explained to the parties, "[W]e may have to fine tune [the evidentiary rulings] as we go along," although "as a general matter the State's evidence would be admissible." The court also informed the parties that, if requested, it would be receptive to giving the jury a limiting instruction concerning the Internet searches.

[¶23]  At the conclusion of the pretrial hearing, the State agreed to limit its questioning to instances that were relevant to the charged conduct, and Vrooman's attorney informed the court that he was willing to work with the State to resolve his objection to this evidence.

[¶24]  We discern no error in the court's pretrial rulings. The limited testimony allowed by the court was directly relevant to refute Vrooman's claim

that his repeated touching of the victim's breasts was a mistake. Evidence of other bad acts is admissible if "probative of motive or intent rather than propensity to commit crime." *State v. Lemay*, 2012 ME 86, ¶ 26, 46 A.3d 1113. The court did not err in determining, pursuant to Rules 401 and 404(b), that the evidence of Vrooman viewing teenage girls or young women in suggestive and provocative settings was admissible because it was directly relevant to his intentions and assertions of mistake in his conduct with the twelve-year-old victim.

[¶25] We further conclude that the court acted within its discretion in determining that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. *See* M.R. Evid. 403. The court's Rule 403 analysis, carefully undertaken, balanced the relevance of the evidence against the potential prejudice to Vrooman by limiting the evidence to testimony about his viewing of images of teenage girls or young women, rather than pornography generally. The court's ruling that the evidence would be presented through testimony rather than publication of the specific images further reduced the risk of prejudice to Vrooman.

2. Trial Rulings

[¶26] Although Vrooman did not object at trial to testimony that differed from the expected testimony described at the pretrial conference, we take this opportunity to address this not-unusual circumstance in criminal proceedings when

12

a defendant has raised a Rule 403 issue in limine. As is often the case in trials, not all of the evidence described to the court before trial came in exactly as anticipated at the pretrial hearing. The record indicates that Harrison made statements to police before trial that Vrooman had a "porn issue." Vrooman objected in limine to the admission of evidence regarding a generalized issue with pornography. Harrison also told the police before trial that Vrooman viewed pornography portraying young women or teenage girls. The State indicated at the in limine hearing that it expected to focus its questions on the more specific teen and young adult pornography that the court had determined was relevant. At trial, however, Harrison testified only regarding her more general observation that Vrooman "had a porn issue."[2]

[¶27]   Vrooman could have objected to Harrison's testimony about him having "a porn issue," arguing that the probative value of evidence that he looked at pornography, without more, was substantially outweighed by the risk of unfair prejudice. *See* M.R. Evid. 403. However, likely for tactical reasons, Vrooman chose not to object.[3] This situation—illustrating the unpredictable nature of

---

[2]  Fasulo did testify as anticipated. He described the evidence found on Vrooman's home and work computers, which included Internet searches using search terms such as "Teen Dancing" that led to websites that contained sexually suggestive videos purporting to depict teenage girls.

[3]  Vrooman, after waiving his Fifth Amendment right not to testify, took the stand and admitted to viewing provocative images depicting teens on his home and work computers. He testified that he did not find the images showing teenagers sexually arousing but "would get a kick out of watching these kids prancing around trying to imitate their favorite singers or whatever on MTV and trying to act all big and

trials—exemplifies why pretrial Rule 403 rulings are generally preliminary and why, if the unanticipated testimony is considered damaging, counsel must be prepared to object when testimony offered at trial differs from, or goes beyond, what the court allowed in an earlier ruling or when the context for the ruling has changed.

[¶28]  In the context of Vrooman's trial, we conclude that the admission of Harrison's testimony regarding a general pornography problem did not result in an obvious error.  *See* M.R. Crim. P. 52(b); *State v. Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147 (characterizing "obvious error as a seriously prejudicial error tending to produce manifest injustice" (quotation marks omitted)).  Her testimony was brief and was accompanied by the testimony of others—including Harrison's son, Fasulo, and Vrooman himself—all of whom focused on the specific images purportedly depicting teenage girls or young women.  The admission of the more general testimony concerning "a porn issue" did not affect Vrooman's substantial rights because he has not shown a reasonable probability that, but for the admission of that testimony, the result of the proceeding would have been different.  *See* M.R. Crim. P. 52(b); *Pabon*, 2011 ME 100, ¶¶ 29, 34-35, 28 A.3d 1147.

---

grown up."  According to his testimony, it was possible that he viewed such images before going into the victim's bedroom.  Vrooman admitted that he did touch the victim's breasts on "a couple of occasions." He also conceded, "There were probably times . . . that I would straddle her to hold her down to tickle her. . . . I never touched her inappropriately intentionally anyway.  But would I hold her down?  Yes."

The entry is:

Judgment affirmed.

_____

**On the briefs:**

Stephen C. Peterson, Esq., West Rockport, for appellant Gregory W. Vrooman

Janet T. Mills, Attorney General, and Deborah P. Cashman, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Stephen C. Peterson, Esq., for appellant Gregory W. Vrooman

Deborah P. Cashman, Asst. Atty. Gen., for appellee State of Maine