MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2013 ME 88
Docket:        Aro-12-332
Argued:        September 9, 2013
Decided:       October 29, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, <u>MEAD</u>, GORMAN, and
               JABAR, JJ.

STATE OF MAINE

v.

THAYNE M. ORMSBY

MEAD, J.

[¶1]  Thayne M. Ormsby appeals from a judgment of conviction entered by the trial court (*Hunter, J.*), and from the sentences it imposed, following jury verdicts convicting him and finding him criminally responsible for three counts of murder, 17-A M.R.S. § 201(1)(A) (2012), and one count of arson (Class A), 17-A M.R.S. § 802(1)(A) (2012).  Ormsby contends, inter alia, that the court erred in (1) denying his motion to suppress statements that he made to the Maine State Police, (2) declining to instruct the jury concerning the potential consequences of a verdict of not criminally responsible by reason of insanity, and (3) imposing three concurrent life sentences on the murder convictions and a consecutive fifteen-year sentence on the arson conviction.  Discerning no error, we affirm the judgment and the sentences.

## I. BACKGROUND

[¶2]   Viewed in the light most favorable to the jury's verdict, the record supports the following facts.  *See State v. Patton*, 2012 ME 101, ¶ 2, 50 A.3d 544. On June 23, 2010, Jason DeHahn's brother went to Jeffrey Ryan's residence in Amity several times in an attempt to locate Jason, a friend of Jeffrey Ryan who had not come home the previous night.  On his third visit, Jason's brother shined his flashlight inside Ryan's trailer.  Seeing a large amount of blood, he retreated and called his father.  The two men entered the trailer, where the father discovered the body of ten-year-old Jesse Ryan, Jeffrey Ryan's son.  He then left and called 911.

[¶3]   Trooper Carman Lilley of the Maine State Police responded to the call. He located Jesse Ryan's body inside the trailer, and another officer who arrived at the scene showed Lilley the body of Jeffrey Ryan that had been found outside in a shed.  About ninety minutes later, a third officer showed Lilley the body of Jason DeHahn that had been located in the bushes on the Ryan property.  The former Deputy Chief Medical Examiner testified that all three died as a result of multiple sharp-force injuries, and Jason DeHahn's throat had been cut.  Three days after the bodies were discovered, Jeffrey Ryan's burned pickup truck was located in Weston.

[¶4]   The investigation of the murders soon focused on Thayne Ormsby. Maine State Police Detectives Dale Keegan and Adam Stoutamyer interviewed

him in New Hampshire on June 29 and July 2, 2010. Following the July 2 interview, during which he confessed to killing the Ryans and DeHahn, Ormsby was arrested, charged with three counts of murder and one count of arson, and returned to Maine after he waived extradition.

[¶5] Ormsby was indicted and arraigned, and entered pleas of not guilty. The court appointed counsel to represent Ormsby and ordered that Ormsby undergo a mental examination. In February 2011, Ormsby moved to suppress all oral and written statements that he made to law enforcement. The court heard the motion on June 30, 2011, and denied it by written order. In May 2011, Ormsby amended his not guilty pleas to include pleas of not criminally responsible by reason of insanity, electing to have a two-stage trial pursuant to 17-A M.R.S. § 40 (2012).

[¶6] Jury selection was held on April 4, 5, 6 and 9, 2012. Following the administration of a written questionnaire to potential jurors and two days of individual voir dire during which they were questioned by the court and the parties' attorneys, the court determined that a fair and impartial jury could be selected and denied Ormsby's motion to change venue. Phase one of the trial, in which the jury was required to decide whether Ormsby was guilty or not guilty of committing the crimes charged, ended with the jury returning verdicts of guilty on each count. At the conclusion of phase two, in which the jury was required to

decide whether Ormsby was either criminally responsible for the crimes or not criminally responsible by reason of insanity, the jury returned verdicts of criminally responsible on each count.

[¶7]   Ormsby's motion for a new trial, asserting many of the grounds advanced in this appeal, was denied.   The court held a sentencing hearing on June 7, 2012, at which it entered judgment and sentenced Ormsby to concurrent life terms for each of the three murders and a consecutive fifteen-year term for arson.   Ormsby appealed and filed an application to allow an appeal from sentence; we granted leave to appeal pursuant to M.R. App. P. 20(g)-(h).

## II.  DISCUSSION

[¶8]  We address the denial of Ormsby's motion to suppress, his proposed jury instruction concerning the consequences of a verdict of not criminally responsible by reason of insanity, and the sentences imposed by the trial court. Ormsby challenges several other rulings the court made during the trial.[1]  We have fully considered his arguments on those issues, find no error in the court's resolution of them, and do not discuss them further.

---

[1]  Ormsby contends that the court erred or abused its discretion in denying his (1) request to call the director of the State Forensic Service as a rebuttal witness at trial; (2) request to elicit expert opinion testimony concerning whether he was able to appreciate the wrongfulness of his conduct; and (3) motions to change venue, for a mistrial, and to sequester the jury.

A.    Motion to Suppress

[¶9]  Ormsby contends that the court should have suppressed statements he made to the State Police during the July 2, 2010, interview, including his oral and written confessions to the murders, because (1) the interview, lasting more than five hours, was custodial in its entirety and he unambiguously invoked his Fifth Amendment rights to remain silent and to counsel during that custodial interrogation; (2) he did not effectively waive his rights following *Miranda* warnings on either of the two occasions when those warnings were read to him; and (3) his statements were not voluntary.  Although Ormsby also challenged in the trial court statements he made during the June 29 interview, he does not do so on appeal.  We review the denial of a motion to suppress "for clear error as to factual issues and de novo as to issues of law," and will "uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision."  *State v. Vrooman*, 2013 ME 69, ¶ 11, 71 A.3d 723 (quotation marks omitted).

1.    Custody

[¶10]    Ormsby was given *Miranda* warnings at the beginning of the interview.  He contends that almost two hours into the questioning he asserted his rights to remain silent and to speak to counsel three times:

KEEGAN:  Thayne.  I want the truth.

ORMSBY: I know you want the truth, [b]ut I'm gonna have to plead the 5th at this point.

KEEGAN: Ok, alright. Does that mean you want to stop talking or?

ORMSBY: For a minute.

. . . .

ORMSBY: I don't want my name released [to the press].

KEEGAN: Oh ok, ok, one step at a time. You're responsible for this right?

ORMSBY: I won't say.

KEEGAN: Ok. Why don't you go have some . . . We'll get a cigarette break. Ok, Adam [Stoutamyer], you'll go out and have a little cigarette.

STOUTAMYER: . . . coffee.

KEEGAN: We'll talk some more?

ORMSBY: Possible.

. . . .

ORMSBY: You know I am glad at this point, so I'd be willing to tell you everything you want to know.

KEEGAN: I'm sorry, what?

ORMSBY: Perhaps I do need a lawyer?

KEEGAN: Ok. Go have a smoke, we'll come back and we'll finish this up.

At that point Ormsby, accompanied by Stoutamyer, took a break lasting about twenty minutes.

[¶11]  The State had the burden at the suppression hearing to prove, by a preponderance of the evidence, its contention that Ormsby was not in custody during the first portion of the July 2 interview.  *State v. Prescott*, 2012 ME 96, ¶ 10, 48 A.3d 218.  If Ormsby was in custody before the break, unambiguously asserted his rights, and was ignored by the detectives, then his confession following the break is subject to suppression.  *See State v. Grant*, 2008 ME 14, ¶ 23, 939 A.2d 93 (stating that a defendant's post-*Miranda* statements are inadmissible if a "previous invocation of his right to remain silent was clear, occurred while he was in custody, and if the government failed to scrupulously honor his right after it was invoked"); *State v. Nielsen*, 2008 ME 77, ¶ 15, 946 A.2d 382 (stating that, when in custody, "If a defendant invokes his right to counsel at any time . . . he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." (quotation marks omitted)).  If Ormsby was not in custody, then his Fifth Amendment rights could not have been invoked to bring about a constitutionally-required end to questioning.  *See United States v. Ellison*, 632 F.3d 727, 731 (1st Cir. 2010); *State v. Nightingale*, 2012 ME 132, ¶ 19, 58 A.3d 1057 (stating that before the *Shatzer* rule limiting police reinterrogation of a suspect becomes relevant "a suspect must

8

first invoke his or her *Miranda* right to counsel *while in custody.*" (emphasis added)); *State v. Lavoie*, 562 A.2d 146, 150 (Me. 1989) ("The protection afforded by *Miranda* is confined to the custodial setting.").

[¶12]  The court found that Ormsby was not in custody before the break, but was in custody after the break concluded when he told detectives, "Your search is over."[2]  "[W]e defer to the motion court's factual findings, but review its custody determination de novo." *Prescott*, 2012 ME 96, ¶ 10, 48 A.3d 218.  In determining whether Ormsby was in custody, "the ultimate inquiry is whether a reasonable person standing in the shoes of [the defendant would] have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *Nightingale*, 2012 ME 132, ¶ 15, 58 A.3d 1057 (quotation marks omitted).

[¶13]  The test for custody "is an objective one, taking into consideration a number of factors in their totality, not in isolation." *Prescott*, 2012 ME 96, ¶ 11, 48 A.3d 218.  Accordingly, "the subjective intent or beliefs of either the police or the suspect play no role in the legal determination except to the extent that they manifest themselves outwardly and would affect whether a reasonable person

---

[2]  The State does not contest the trial court's finding that the interview became custodial after Ormsby returned from the break.

would feel constrained to a degree commensurate with police custody." *Id.* (alteration and quotation marks omitted).

[¶14] Although not an exhaustive list, factors that may be considered in determining whether a person is in custody for Fifth Amendment purposes include

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*Id.*

[¶15]  We find no error in the trial court's determination that Ormsby was not in custody during the first part of the interview occurring before the break.  The following factual findings made by the court are supported by the record.  *See State v. Ntim*, 2013 ME 80, ¶ 9, --- A.3d --- ("We review the suppression court's factual findings to determine whether those findings are supported by the record, and will only set aside those findings if they are clearly erroneous." (quotation marks omitted)).

[¶16]  Detectives Keegan and Stoutamyer initiated contact with Ormsby on the morning of July 2 by going to the Dover, New Hampshire apartment where he was staying and asking to speak to him.  This was their second contact with Ormsby, the first having occurred on June 29.  On the first occasion, Ormsby, who admitted he was aware of the killings in Amity, agreed to speak to the detectives in their car parked near the apartment.  The recorded interview lasted about an hour.  Ormsby agreed to provide a DNA sample and his fingerprints, and agreed to another interview should it be needed.  When the detectives dropped Ormsby off at his apartment after taking his fingerprints at the Dover police station, Keegan asked him, "[D]id you do this?"  When Ormsby said that he had not, Keegan told him, "[O]kay, just want you to know that if you didn't, you don't have anything to worry about; but if you did this, I'm going to get you and I'm going to prove it."

[¶17]   By the time they returned unannounced for a second interview on July 2, the detectives had connected Ormsby's DNA and fingerprints to the crime scene and had identified inconsistencies in what he had told them during the first interview.  The court found that Ormsby was by then the focus of the investigation and that probable cause existed to arrest him.  Keegan, Stoutamyer, and a Dover police officer went to the door of the apartment where Ormsby was staying.  Several other officers were in the vicinity, although it is not clear whether Ormsby saw them.  Ormsby was not at the apartment but returned shortly, arriving simultaneously with another Dover officer.

[¶18]   Ormsby agreed to talk to the detectives again, and agreed to do so at the Dover police station after Keegan explained that it would be easier for him to take phone calls and receive faxes there.  Ormsby was not told that his DNA and fingerprints had been connected to the crime scene.  He was cooperative, and when he began to empty his pockets while still in the apartment, Keegan told him that he was not under arrest, that he could bring his possessions with him, and that he did not have to meet with the detectives at all.  After a short ride, Ormsby and the detectives entered police headquarters, located on the ground floor of the City Hall building, and went to an interview room.

[¶19]   The parties agreed at the hearing, and the court found in its order denying the motion to suppress, that the best evidence of what transpired in the

12

interview room is a video recording of the entire interview that was admitted in evidence. The video is also part of the record on appeal; it fully supports the court's extensive factual findings concerning events and conversations occurring inside the room. As the interview began, Ormsby sat next to the door, which was left ajar several inches throughout. He was not restrained in any way. Although Keegan and Stoutamyer were both present much of the time, Keegan conducted the interview almost entirely by himself. Both detectives wore plain clothes; Keegan wore a jacket, and Stoutamyer wore a shirt and tie, leaving his weapon and handcuffs visible. The court found that for the first fifteen minutes of the interview Ormsby "engaged the officers in a wide ranging, often light hearted, discussion of [various] topics."

[¶20] Keegan then told Ormsby that he was not under arrest and that he was free to leave. Ormsby replied that he would be "shocked" if he were under arrest and said, "I'm here to cooperate." Keegan read *Miranda* warnings and asked Ormsby what he understood each to mean; Ormsby explained that the right to remain silent meant "plead the 5th," and asked, "Do I need to talk to a lawyer?" After Keegan answered, "that's up to you," Ormsby agreed to answer his questions.

[¶21] About ninety minutes into the substantive portion of the interview, Keegan said to Ormsby, "[w]ell now we have a problem," telling him that his

DNA and fingerprints were on recently-used items at the crime scene, and therefore his statement that he had last been at Jeffrey Ryan's residence some two weeks before the murders was not credible. The court found that "[a]lthough Det. Keegan did not display anger, hostility or aggression towards [Ormsby], he did adopt a more direct manner." As Ormsby began to make concessions in response to Keegan's questions, he told Keegan, "You know more than I do," to which Keegan replied, "I know everything . . . and soon you're gonna know that I know that you know . . . it's a little dance we're doing, but you know that I know." As the interview continued over the next six minutes, Ormsby made the three statements that he contends required an end to further questioning. During that time he said he was going to take a break for coffee and a cigarette; the first part of the interview concluded when he went outside with Stoutamyer.

[¶22] The lengthy video afforded the trial court, and gives this Court, a unique opportunity to evaluate the questioning once Ormsby arrived at the station. The interview begins in a friendly way. Ormsby has coffee, sits by a door left ajar, and is by all appearances comfortable. He was told that he was not under arrest and was free to leave, and acknowledged his understanding of that statement by saying he would be "shocked" if he were under arrest. He was advised of his right not to answer questions and to have the assistance of counsel, agreed to answer questions, and was thereafter in full control of himself, appropriately answering

questions when he chose to and declining to answer them when he chose not to. As the court found, Ormsby's demeanor was "calm and engaged throughout," and Keegan's "demeanor and tone . . . was consistently cordial and nonthreatening." Until Keegan said, "[w]ell now we have a problem," Ormsby was not confronted with physical evidence that police had connecting him to the crime scene, and even then Keegan at first only expressed concern that the evidence showed Ormsby was at Jeffrey Ryan's residence closer in time to the murders than he had previously acknowledged.

[¶23]  Viewing the court's supported factual findings objectively, it did not err in concluding that during the first part of the interview a reasonable person standing in Ormsby's shoes would have felt that he could terminate the interview and leave if he wished.  *See Nightingale*, 2012 ME 132, ¶ 15, 58 A.3d 1057; *Prescott*, 2012 ME 96, ¶ 11, 48 A.3d 218.  Because Ormsby was not in custody, references he made to his right to remain silent and to speak to counsel, assuming *arguendo* that they constituted an unambiguous invocation of those rights, did not require an end to questioning.  *See Ellison*, 632 F.3d at 731; *Nightingale*, 2012 ME 132, ¶ 19, 58 A.3d 1057.

2.  Waiver Following *Miranda*

[¶24]  When they went outside for a cigarette break, Ormsby asked Stoutamyer "what [Stoutamyer] felt he was going to be looking at or facing";

Stoutamyer replied that "this was a pretty serious matter and . . . a pretty serious issue." The court found that otherwise the two engaged in casual conversation, except when Stoutamyer noticed that Ormsby's eyelashes were burned and curled at the ends, and he commented to Ormsby that the observation led him to believe that Ormsby was the one who had burned Jeffrey Ryan's truck. When Keegan came out at the end of the break, Ormsby said, "Well, your search is over."

[¶25] Ormsby cried softly for a brief time when the interview resumed after the break, telling Stoutamyer, "This is the first time I've cried." When Stoutamyer went to get Ormsby coffee, Keegan told him that he could not make any promises about how the media would treat the case. Ormsby acknowledged that "you can't control that and you can't promise me anything." He told Keegan, "Out of free will I will give you what you want."

[¶26] Keegan read *Miranda* warnings for the second time and told Ormsby that he was doing so because of Ormsby's previous comments concerning possibly talking to a lawyer and "invok[ing] the 5th." When Ormsby asked, "This time I am under arrest?" Keegan told him "you are not under arrest." Following the *Miranda* warnings, Ormsby said that he wanted to answer questions. During this second portion of the interview, Ormsby confessed to the murders.

[¶27] We review de novo the question of whether the State established by a preponderance of the evidence that Ormsby made a knowing, intelligent, and

voluntary waiver of his rights under *Miranda*. *State v. Lockhart*, 2003 ME 108, ¶ 21, 830 A.2d 433. On this record, we find no error in the trial court's determination that he did so. Accordingly, the court did not err in declining to suppress Ormsby's statements made during the second part of the interview, including his confession.

3. Voluntariness

[¶28] The court found beyond a reasonable doubt that Ormsby's oral and written statements were voluntary. *See State v. Wiley*, 2013 ME 30, ¶ 15, 61 A.3d 750 ("A confession is admissible in evidence only if it was given voluntarily, and the State has the burden to prove voluntariness beyond a reasonable doubt."). Because it is primarily a question of fact, the court's voluntariness determination is reviewed for clear error, although its application of the law to its factual findings is reviewed de novo. *Id.* It is well established that "[a] confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *Id.* ¶ 16 (quotation marks omitted).

[¶29] Here, the lengthy video conclusively supports the court's determination. Ormsby presents throughout the interview as intelligent and in full control of his faculties, emotions, and decision-making. He neither shows nor expresses any indication of being under duress or under the influence of any

substance. He became emotional at the beginning of the second part of the interview, but not overly so. No promises of leniency were made by either detective, nor did either make any threats. After Ormsby returned from the break he told Keegan that, "[o]ut of free will I will give you what you want," and later told him that he and Stoutamyer "have been gentlemen." He acknowledged that, "I could have not said anything, I could have asked for a lawyer, I didn't have to tell you shit." During the second part of the interview encompassing his oral and written confessions, Ormsby was afforded several breaks for the restroom, cigarettes, and coffee, and he was offered food. Finally, during the interview he was twice formally advised of his right not to make any statements. On this record, there is simply no indication that Ormsby's free will was overborne or that the admission of his statements would be fundamentally unfair.

4.    Conclusion

[¶30]  Examining the record to see "if any reasonable view of the evidence supports the trial court's decision," *Vrooman*, 2013 ME 69, ¶ 11, 71 A.3d 723 (quotation marks omitted), reveals that the court did not err in determining that Ormsby's oral and written confessions were made voluntarily and that their admission at trial did not violate his Fifth Amendment rights. Accordingly, the court correctly denied his motion to suppress.

18

B.      Jury Instructions

[¶31]  Ormsby asked the court to give an instruction in phase two of the trial informing the jury of the consequences of a verdict of not criminally responsible by reason of insanity, asserting that "such instruction is necessary to dispel the jurors' natural assumption that an insanity verdict would result in . . . immediate release from custody."  The court declined, citing our decision in *State v. Okie*, where we rejected an identical argument.  2010 ME 6, ¶¶ 7, 14, 987 A.2d 495.  In *Okie*, we cited fifty years of state and federal precedent for the proposition that "it is not appropriate to instruct the jury on the institutional consequences of an insanity verdict to a defendant."  *Id.* ¶¶ 9-10.  We explained that "[t]he practice of not informing the jury of the consequences of its verdict is justified in large part by the distinction between the roles of the judge and the jury," and so "the consequences of a particular verdict are . . . technically irrelevant to the jury's task."  *Id.* ¶ 11.  The denial of a requested jury instruction is reviewed for prejudicial error.  *Id.* ¶ 15.

[¶32]  Ormsby asserts that, by proffering to the trial court an expert's report containing a review of academic literature concerning this subject, he has accepted our implied invitation to reconsider *Okie*.  He is correct insofar as we noted in *Okie*:

> Conspicuously absent . . . from the record before us . . . is any empirical data or other persuasive evidence suggesting that jurors in fact do suffer from the mistaken assumption that insane defendants are simply set free. As the United States Supreme Court noted, "there is no reason to assume that jurors believe that defendants found [not criminally responsible by reason of insanity] are immediately set free." Unless and until such empirical data or other persuasive evidence indicate otherwise, we decline Okie's invitation to reconsider [our precedent].

*Id.* ¶ 14 (citation omitted) (second alteration added).

[¶33] Ormsby is incorrect, however, in his contention that the report he submitted is sufficiently persuasive to require us to make the assumption he urges and reconsider our long-standing precedent. As the trial court found, the report lacks data concerning prevailing beliefs in Maine as opposed to other states, fails to consider the differences between trial practice in Maine and other states cited, and does not account for what is likely a disproportionate number of responses from younger citizens in the studies it cites. Beyond the question of relevance, the report's conclusions are not compelling enough to mandate that we alter a fundamental principle of our system of criminal justice, namely that "judges determine what sentence to impose, and juries are charged only with finding facts and deciding the defendant's guilt based on those facts." *Id.* ¶ 11. To hold otherwise without convincing evidence that Maine jurors are likely to believe that defendants found to be insane simply go free "invites them to ponder matters that

are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* (quotation marks omitted).[3]

C.    Sentencing

[¶34]    Ormsby contends that the court improperly considered his failure to accept responsibility for his crimes as an aggravating factor in step two of its sentencing analysis, and that it improperly imposed a consecutive sentence on his conviction for arson.

[¶35]    We review a criminal sentence "for disregard of the relevant sentencing factors or abuse of the court's sentencing power." *State v. Koehler*, 2012 ME 93, ¶ 32, 46 A.3d 1134.  The sentencing power referred to is exercised through the application of the three-step process set out in 17-A M.R.S. § 1252-C

---

[3]  In every criminal case, whether an insanity plea is involved or not, it is human nature for jurors to be curious about the result of their verdict.  The usual instruction that they are not to consider the consequences of their decision frees jurors of the responsibility for deciding what that result should be, thus allowing them to focus solely on their task of finding the facts and applying the law to produce a just verdict.  Although a verdict of not guilty by reason of insanity is different in a legal sense because it results in the defendant being absolved of criminal responsibility for his conduct, from the perspective of the jurors the question is the same as in an ordinary criminal case—what will happen if we decide one way or the other?

If, as Ormsby urges, a court is required to explain that an insanity verdict does not result in the defendant simply walking out of the courthouse, then it must also explain that he could be permanently released from a mental health institution within a short period of time.  *See* 15 M.R.S. § 104-A(1), (3) (2012).  Such an instruction invites the jury to do justice by reaching a verdict that produces what it deems a "fair" result—because why else would the court tell it what the potential results are—rather than by finding the facts and then faithfully applying the law to those facts to arrive at a verdict.  The verdict emerging from that process might unjustly benefit the defendant by allowing him to avoid incarceration when he was in fact sane when the crime was committed, or, equally likely, might unjustly punish him with years of incarceration for conduct for which he was not criminally responsible.  The real possibility of either outcome mandates that we take the step Ormsby proposes only if the most persuasive evidence dictates that justice would be better served as a result.

(2012),[4] except in the case of murder, when only the first two steps apply. *See State v. Nichols*, 2013 ME 71, ¶ 12, 72 A.3d 503; *Koehler*, 2012 ME 93, ¶ 33, 46 A.3d 1134. Ormsby does not challenge the court's step-one sentencing analysis, in which it arrived at a basic sentence of life for each of the three murders, and fifteen years for the arson.[5]

[¶36] In its step-two analysis the court noted several mitigating factors, including Ormsby's young age and intelligence, his lack of an adult criminal record, his family's support, and his accomplishment in earning a high school diploma while he was incarcerated awaiting trial. The court also took note of

---

[4] Title 17-A M.R.S. § 1252-C (2012) provides:

In imposing a sentencing alternative pursuant to section 1152 that includes a term of imprisonment relative to murder, a Class A, Class B or Class C crime, in setting the appropriate length of that term as well as any unsuspended portion of that term accompanied by a period of probation, the court shall employ the following 3-step process:

**1.** The court shall first determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the offender.

**2.** The court shall next determine the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case. These sentencing factors include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest.

**3.** The court shall finally determine what portion, if any, of the maximum period of imprisonment should be suspended and, if a suspension order is to be entered, determine the appropriate period of probation to accompany that suspension.

[5] A basic sentence of life on each of the three murder counts was justified by the court's finding of two of the aggravating circumstances that we have recognized: premeditation-in-fact and multiple deaths. *See State v. Waterman*, 2010 ME 45, ¶¶ 44-45, 995 A.2d 243.

Ormsby's difficult childhood and the lack of effective treatment for his mental health issues, which it summed up as "a denial of social justice to the defendant."

[¶37]  The court found as an aggravating factor that the three victims knew that they were likely to die, and suffered fear and physical pain before their deaths. In the case of Jason DeHahn, who escaped the residence after being stabbed by Ormsby only to have his throat cut repeatedly once outside, the court found that "he felt not only physical pain, but an unimaginable fear for his life prior to his death."  In the case of ten-year-old Jesse Ryan, the court considered his young age, and noted that "it is difficult to contemplate the physical pain and fear that [he] must have experienced" after witnessing the initial stabbing of DeHahn, fleeing to his bedroom, and then being found by Ormsby and stabbed to death.  The court found that Jesse, like DeHahn, "surely also experienced unimaginable fear" before he died.

[¶38]  Only after taking into account the victim impact involved did the court take note of "the fact that the defendant has not accepted responsibility for his crime," which is the finding Ormsby challenges.  Refusal to take responsibility is an allowable consideration.  *Koehler*, 2012 ME 93, ¶ 35, 46 A.3d 1134.  The court did not articulate the basis for its finding, but it could have considered the evidence that Ormsby killed the two witnesses to the initial murder, attempted to gather and then destroy physical evidence that might link him to the scene, burned

Jeffrey Ryan's stolen truck, hid at the residence where he had been staying while law enforcement initially investigated the killings, fled the state, denied that he was involved when the State Police initially interviewed him, and then maintained that denial well into his second interview, during which he attempted to justify the killing of Jeffrey Ryan as a "bad person."

[¶39]  Although "[i]t is black-letter law that an accused cannot be punished by a more severe sentence because he unsuccessfully exercised his constitutional right to a trial," *State v. Farnham*, 479 A.2d 887, 891 (Me. 1984), there is nothing in this record to indicate that the court, as Ormsby contends, improperly used the exercise of his right to put the State to its proof as an aggravating factor to increase his sentence.  Furthermore, it is clear from the court's sentencing analysis that Ormsby's failure to accept responsibility was dwarfed in importance by the grave victim impact the court found to exist.

[¶40]  Also contrary to Ormsby's contention, the court did not abuse its discretion in imposing a consecutive sentence for the arson conviction after finding that it "was an entirely separate and distinct criminal episode and not directly . . . part of the events resulting in the murder[s]."  *See* 17-A M.R.S. § 1256(2)(A) (2012); *State v. Faulcon*, 2005 ME 119, ¶ 4, 887 A.2d 510 (stating the standard of review).  That factual finding is supported by record evidence that Ormsby drove away from the murder scene in Jeffrey Ryan's stolen truck and only later, in a

24

different location, burned it.  *See State v. Ward*, 2011 ME 74, ¶ 31, 21 A.3d 1033 ("A crime does not facilitate a later attempt to cover up that crime, nor does an attempted cover-up facilitate what has already occurred.").

The entry is:

Judgment and sentences affirmed.

_____

**On the briefs:**

James M. Dunleavy, Esq., Currier and Trask, P.A., Presque Isle, and Sarah E. LeClaire, Esq., Presque Isle, for appellant Thayne M. Ormsby

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Sarah E. LeClaire, Esq., for appellant Thayne M. Ormsby

Donald W. Macomber, Asst. Atty. Gen. for appellee State of Maine

Aroostook County (Houlton) Superior Court docket number CR-2010-81
FOR CLERK REFERENCE ONLY